**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAILESH PATEL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff<br><br>v.<br><br>NAPCO SECURITY TECHNOLOGIES, INC., RICHARD L. SOLOWAY and KEVIN S. BUCHEL<br><br>Defendants. | No. 2:25-cv-02308-LDH-LGD<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Gregory M. Potrepka
Amanda D. Foley
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
afoley@zlk.com

*Lead Counsel for Co-Lead Plaintiff Shailesh Patel and the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
Murielle J. Steven Walsh
Emily C. Finestone
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mjsteven@pomlaw.com
efinestone@pomlaw.com

*Lead Counsel for Co-Lead Plaintiff Donna Kramer and the Class*

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Plaintiffs ..... 6

B. Defendants ..... 6

C. Relevant Non-Parties ..... 8

IV. ADDITIONAL SUBSTANTIVE ALLEGATIONS ..... 10

A. Napco Depends on Equipment Sales to Generate the Majority of its Revenue and Growth ..... 10

B. Defendants Set Aggressive FY2026 Growth Targets Dependent on Equipment Sales ..... 13

C. Defendants Admit They Closely Tracked and Reviewed Granular Distributor and End-User Demand and Sales Data From "Sell-Through" Data They Received Directly from Distributors ..... 15

D. Immediately Prior to and Throughout the Class Period, Napco's Failure to Keep Up with Technology Causes it to Lose Sales and Market Share to Competitors ..... 16

1. Napco's Lack of Technological Innovation Made Its Products Obsolete ..... 16

2. Sales Were Declining in the Access Pro Division Due to a Lack of Innovation and Failure to Compete Technologically ..... 18

3. Sales Were Declining in the Fire and Security Alarm Division Because Napco Did Not Offer the Modern Features and Technology that Consumers Wanted ..... 21

4. Sales Were Declining in the Inside Sales Division ..... 23

E. Throughout the Class Period, Napco's Three Largest Distributors Were Significantly Destocking Napco Products as Customer Demand Fell ..... 25

F. As Napco was "Struggling" to Sell Prima, Defendants Began Offering Undisclosed Rights of Return on Prima to Boost Sales ..... 27

G. Napco Concealed Declining Sales by Falsely Touting Increased Recurring Revenues ..... 30

V. MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS ..... 34

A. February 5, 2024 Press Release and Earnings Call ..... 35

B. February 5, 2024 10-Q ........ 44

C. May 6, 2024 Earnings Call ........ 49

D. May 6, 2024 10-Q ........ 54

E. August 26, 2024 Earnings Call ........ 59

F. August 29, 2024 10-K ........ 63

G. November 4, 2024 Press Release and Earnings Call ........ 69

H. November 4, 2024 10-Q ........ 74

VI. THE TRUTH EMERGES ........ 77

A. September 5, 2024 Partially Corrective Disclosure ........ 77

B. November 4, 2024 Partially Corrective Disclosure and Materialization of the Risk ........ 78

C. February 3, 2025 Partially Corrective Disclosure and Materialization of the Risk ........ 81

VII. POST-CLASS PERIOD EVENTS CONFIRMING DISTRIBUTOR DESTOCKING AND DECLINING EQUIPMENT SALES WERE MORE THAN "TEMPORARY" ........ 84

A. May 5, 2025 Press Release and Earnings Call ........ 84

B. August 25, 2025 Press Release and Earnings Call ........ 85

VIII. THE INDIVIDUAL DEFENDANTS ACTED WITH SCIENTER ........ 85

A. Defendants' Admittedly Accessed and Reviewed Detailed Distributor and End-User Sales and Inventory Data on a Real-Time Basis ........ 86

B. Defendants Received POS Reports Showing Declining Sales, Which They Discussed at Weekly Sales Meetings Throughout the Class Period ........ 87

C. The Core Operations Doctrine Supports a Strong Inference of Scienter ........ 87

D. Defendants' Suspicious Stock Sales Support an Inference of Fraud ........ 88

IX. LOSS CAUSATION ........ 92

A. September 5, 2024 Partial Disclosure ........ 93

B. November 4, 2024 Partial Disclosure and Materialization of the Risk ........ 94

C. February 3, 2025 Partial Disclosure and Materialization of the Risk ........ 96

X. CLASS ACTION ALLEGATIONS ........ 98

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........ 100

XII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 101

XIII. CLAIMS FOR RELIEF UNDER SECTION 10(B) AND 20(A) OF THE EXCHANGE ACT AND SEC RULE 10B-5 ........ 103

COUNT I For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants) ........ 103

COUNT II For Violations of Section 20(a) of the Exchange Act (On Behalf of the Section 10(b) Class Against the Section 10(b) Individual Defendants) ........ 106

XIV. PRAYER FOR RELIEF (EXCHANGE ACT AND SECURITIES ACT CLAIMS) ........ 108

XV. JURY TRIAL DEMANDED ........ 109

1. Court-appointed Co-Lead Plaintiffs Shailesh Patel and Donna Kramer ("Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation by their undersigned attorneys, which includes, *inter alia*, a review and analysis of: (i) Napco Security Technologies, Inc.'s ("Napco" or the "Company") public filings with the U.S. Securities & Exchange Commission ("SEC"), (ii) Napco's other public statements, including press releases and other announcements, conference call transcripts, presentations, and social media posts; (iii) reports of securities and financial analysts, news articles, government publications, and other commentary and analysis concerning Napco; (iv) interviews with individuals who are former employees of Napco; and (v) information readily obtainable on the internet.

2. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

3. This is a federal securities class action brought on behalf of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Napco between February 5, 2024 and February 3, 2025, inclusive (the "Class Period"), and were damaged thereby, seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

4. Headquartered in Amityville, New York, Napco designs and manufactures security products, including intrusion and fire alarm systems (also referred to as fire and security alarm

systems), door-locking products, and access control systems.[1] The Company's revenue streams are divided into two segments: (i) equipment (hardware) sales; and (ii) recurring service revenue ("RSR") derived from monthly fee revenue charged for security monitoring services. While equipment sales historically comprised the majority of Napco's revenues, service revenues have become an increasingly large percentage of Napco's total revenues.

5. Napco does not sell its equipment directly to end-users. Instead, the Company relies almost entirely on a concentrated network of independent distributors. Two distributors, ADI Global Distribution ("ADI") and Anixter/Wesco ("Wesco"), dominate this channel and account for the overwhelming majority of Napco's equipment sales. Consequently, Napco's financial performance is highly dependent on the purchasing patterns and inventory management strategies of these distributors.

6. Recognizing the critical importance of these distributor relationships, Individual Defendants Richard L. Soloway (CEO) and Kevin S. Buchel (CFO, COO) repeatedly assured investors that they maintained granular visibility into, and closely monitored, distributor demand using "sell-through stats" they receive weekly from distributors, which tracks the rate at which distributors sell Napco products to dealers. Buchel described sell-through stats as the "key stat to look at because that's the vibrancy of the business" that allowed Defendants to accurately assess distributor inventory levels and predict future purchasing behavior.

---

[1] Napco's fiscal year ends on June 30. Thus, Napco's fiscal year 2024 ("FY2024") ended on June 30, 2024, and the quarters in FY2024 were July 1, 2023 through September 30, 2023 ("Fiscal Q1 2024"), October 1, 2023 through December 31, 2023 ("Fiscal Q2 2024"), January 1, 2024 through March 31, 2024 ("Fiscal Q3 2024"), and April 1, 2024 through June 30, 2024 ("Fiscal Q4 2024"). Napco's fiscal year 2025 ("FY2025") ended on June 30, 2025, and the quarters in FY2025 were July 1, 2024 through September 30, 2024 ("Fiscal Q1 2025"), October 1, 2024 through December 31, 2024 ("Fiscal Q2 2025"), January 1, 2025 through March 31, 2025 ("Fiscal Q3 2025"), and April 1, 2025 through June 30, 2025 ("Fiscal Q4 2025").

7. Throughout the Class Period, Defendants repeatedly touted Napco's products in both the locking and fire and alarm security segments as "innovative" with "a lot of features that the dealers like" allowing Napco to beat out competitors, and claimed that sell-through sales data showed equipment sales were "happening faster" and "definitely up sequentially" where Defendants "don't see any slowing down." Such "sequential increase" in equipment sales, Defendants claimed, would generate a "continuation" of recurring service revenue growth and supported the Company's aggressive fiscal year 2026 targets ("FY2026 Targets").

8. Confidential witnesses ("CWs") confirm none of this was true. Rather, according to the CWs, contrary to Defendants' public statements that sales were increasing due to product innovation, Napco's sales were steadily ***declining*** across all products throughout the Class Period because they were obsolete and outdated. CWs reported that Napco's products lacked modern technology, describing them as old, clunky, ugly, too complex, and lacking modern features that customers wanted. Most notably, Napco did not offer the ability to manage alarm and locking products on the cloud like competitor products, which made using Napco products more cumbersome and less convenient.

9. As a result, Napco faced a severe and undisclosed crisis: its largest distributors, began aggressively reducing and then completely stopped purchasing Napco's products (a process known as "destocking") in favor of purchasing more modern competitor products.

10. Defendants were aware of declining equipment sales and distributor destocking, in real-time because, as Defendant Buchel admitted, "[w]e watch all these stats every week, every month. We watch the inventory levels for all of our distributors." CWs also confirmed that, throughout the Class Period, Defendants personally received monthly Point of Sale ("POS")

reports from distributors via email and attended weekly sales meetings reporting declining sales due to lack of product features and innovation.

11. While in possession of this material non-public information, Defendants Soloway and Buchel, collectively, unloaded approximately 4.7 million shares of their personally-held Napco common stock at artificially inflated prices for combined proceeds of approximately $173.9 million.

12. The truth began to emerge on September 5, 2024 when a short seller firm, Fuzzy Panda Research, released a lengthy report (the "Fuzzy Panda Report") revealing that Napco's FY2026 Targets were unlikely to be met because Napco's past success was largely attributable to the 3G sunset, which caused a temporary boost in sales, and that Napco's current recurring revenue stream would soon decline because "[t]he long lag between original equipment radio sales turning into recurring revenue means that the post 3G sunset should finally start showing up in their recurring revenue too." The Fuzzy Panda Report also began to reveal a materialization of the risk of Napco's failure to innovate its products, reporting that Napco's competitors have caught up and now offer better features in their products.

13. In response to the Fuzzy Panda Report, Napco's stock price declined from $43.39 per share on September 4, 2024 to $34.50 per share on September 5, 2024, a decline of $8.89 per share, or 20.5%, on heavy trading volume.

14. On November 4, 2024, Defendants revealed an overall 6% decline in equipment sales and an 8% decline in locking sales due to distributor destocking as a result of a materialization of the undisclosed risk of lost sales and declining demand for Napco's products due to Napco's obsolete technology. Defendant Buchel tempered this disclosure by claiming that, based upon his personal conversations with the distributors, the destocking was only a "temporary[,]" one-quarter

issue. In response to this partial disclosure, Napco's stock price declined from $38.59 per share on November 1, 2024 to $34.51 per share on November 4, 2024.

15. The truth was further revealed on February 3, 2025, when Napco announced its results for the second quarter of fiscal year 2025 (*i.e.*, October 2024 through December 2024), reporting that equipment sales plummeted 25% year-over-year due to intensified destocking by Napco's largest distributors that was not a temporary issue, as Defendants previously represented in the prior quarter. Buchel further revealed that Napco's largest customer had "***eliminated all quarter end purchases from all manufacturers***" to reduce inventory levels.

16. In response to this partial corrective disclosure, Napco's common stock price fell $9.77 per share, or 26.62%, from a close of $36.70 per share on January 31, 2025 (the previous trading day) to close at $26.93 per share on February 3, 2025, on heavy trading volume.

17. Analysts reacted swiftly and negatively. For example, Craig-Hallum Capital Group downgraded Napco, summarizing the quarter as "incredibly disappointing" and noting the update suggested "the company will be far below the $300M with 40% Adj. EBITDA margin goals that management had targeted by the end of 2026." Lake Street Capital Markets slashed its price target, cautioning it was "worried that these headwinds are likely to persist throughout FY25[.]"

18. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock price, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78(a)) and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the Exchange Act claims pursuant to 28 U.S.C. §1331 because the Exchange Act claims arise under the laws of the United States, and Section 27 of the Exchange Act (15

U.S.C. §78aa), which vests exclusive jurisdiction for claims for violations of the Exchange Act in the district courts of the United States.

20. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa(c)), and Section 22 of the Securities Act (15 U.S.C. §77v) because the Defendants transact business in this District, the alleged misstatements and the subsequent damages took place in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

21. In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

22. Co-Lead Plaintiff Shailesh Patel, as set forth in his certification filed in connection with his lead plaintiff application (ECF 14) incorporated by reference herein, purchased Napco common stock during the Class Period at artificially inflated prices and was damaged thereby.

23. Co-Lead Plaintiff Donna Kramer, as set forth in her certification filed in connection with his lead plaintiff application (ECF 15) incorporated by reference herein, purchased Napco common stock during the Class Period at artificially inflated prices and was damaged thereby.

### B. Defendants

24. Napco, a manufacturer of high-tech electronic security devices, is headquartered in New York with its principal executive offices located at 333 Bayview Avenue, Amityville, NY 11701. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "NSSC."

25. Defendant Richard L. Soloway was, at all relevant times, Napco's Founder, Chairman, Chief Executive Officer ("CEO"), President and Secretary and a member of the Napco Board of Directors.

26. Defendant Kevin S. Buchel was, at all relevant times, Napco's Executive Vice President of Operations, Treasurer, Chief Financial Officer ("CFO") and Director on the Napco Board of Directors. On May 2, 2024, Defendant Buchel was promoted to President & Chief Operating Officer ("COO") while maintaining his position as CFO.

27. Defendants Soloway and Buchel are sometimes referred to herein as the "Individual Defendants." Napco, together with the Individual Defendants, are referred to herein as the "Defendants."

28. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Napco's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

29. Napco is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

30. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Napco under *respondeat superior* and agency principles.

### C. **Relevant Non-Parties**

31. CW1 held the title of Customer Service Representative from the Fall of 2023 until March 2025, responsible for providing technical and software assistance to customers and dealers who purchased Napco equipment and assisting with software testing for equipment, including the Prima panels.

32. CW2 worked at Napco from before the Class Period to April 2024, first as Vice President of Sales for the Continental Access (later called Access Pro) division responsible for overseeing the sales team who was selling the Company's door access systems. When Napco rebranded the Continental Access division to Access Pro around April 2023, a new Vice President of Sales was brought in. At that time, CW2 shifted to the Fire and Security alarm system division as its Vice President of Sales and continued in that role until April 2024 overseeing that sales team. In both roles, CW2 reported to Senior Vice President of Marketing and Sales, Stephen Spinelli.

33. CW3 worked as a Regional Sales Manager in Napco's Access Pro Division from before the Class Period to July 2024. CW3 reported to Aaron Black, the Vice President of Sales for Napco's Access Pro division. In this role, CW3 primarily sold Napco products to dealers who are generally the installers that then sell to end users, such as schools, hospitals, hotels, office buildings, and residences.

34. CW4 worked in sales at Napco from Fiscal Q2 2025 into the first quarter of fiscal 2026 reporting to Jim Pless, the Director of Sales, and also to Senior Vice President of Marketing

and Sales, Stephen Spinelli. In that role, CW4 was focused solely on selling Prima and pursued sales with traditional security equipment dealers as well as non-traditional customers, such as professional service offices (dentists, doctors, lawyers, etc.).

35. CW5 was a Regional Sales Manager for Napco in the Access Pro division from September 2024 to November 2024 reporting to Rob Etmans, Director of Sales for Access Pro, who reported to Aaron Black. Black reported to Stephen Spinelli. In this role, CW5 focused on selling Napco's Access pro locking system products to "channel partners" and "integrators" who install locking and full-security systems for end-users. CW5 said those customers were different than the large distributors who were the direct customers for Napco's other products. CW5 said that during CW5's tenure, Napco had three core Access Pro products that customers purchased: the 2100 one-door access control panel; the 2800 eight-door access control panel, and the ASA Server Appliance that supported the 2100 and 2800 systems.

36. CW6 was an Inside Sales Specialist at Napco from December 2023 to April 2025. CW6 reported to David Crews, Director of Sales Operations for Napco products, and Gazime Azima, Inside Sales Manager for Continental products. CW6's job involved processing customer orders and entering the information into the Company's software database.

37. CW7 was a Business Development Manager from August 2024 through December 2025, hired to help increase sales of Prima alarm panels to installers. CW7 reported to Stephen Spinelli, SVP of Marketing and Sales until about January or February 2025, and then reported to Jim Pless, Director of Sales until CW7 left Napco in December 2025.

38. Stephen Spinelli was, at all relevant times hereto, the Senior Vice President of Marketing and Sales for all Napco's corporate divisions, overseeing all sales, distribution channel

partnerships, key accounts, and dealer relationship programs for the Company. Spinelli was hired in July of 2020 and reports directly to CEO Richard Soloway and CFO Kevin Buchel.

39. Aaron Black was a Vice President of Sales overseeing Napco's Access Pro division (formerly Continental Access). Aaron Black was hired in April 2023 and reported directly to Stephen Spinelli. According to Aaron Black's LinkedIn profile, his employment with Napco ended in July 2025.

40. Jim Pless was, at all relevant times, the Director of Sales, Security & Smart Home, reporting to Spinelli.

## IV. ADDITIONAL SUBSTANTIVE ALLEGATIONS

### A. Napco Depends on Equipment Sales to Generate the Majority of its Revenue and Growth

41. Napco develops, manufactures and sells electronic security devices and provides equipment and cellular communication services for intrusion and fire alarm systems. As demonstrated in Figure 1 below, prior to and throughout the Class Period, the Company generated approximately 60% of its revenue from the sale of equipment (hardware) and 40% from recurring monthly revenue subscriptions ("RMR") or recurring service revenue (RSR).

**Figure 1.**




42. Equipment sales are a necessary precursor to generating future recurring service revenue as Napco's RSRs are associated with monthly fees for fire alarm, security monitoring and other services once the equipment is installed.

43. Napco's main equipment products are access control systems, door-locking hardware, intrusion and fire alarm systems and video surveillance products, which are provided for commercial, residential, institutional, industrial and governmental applications.

44. Within equipment sales, the door locking products are a particularly critical segment of Napco's business, as they represent approximately 60% of Napco's hardware sales and carry significantly higher gross margins than other equipment. While Defendants do not regularly provide the percentage sales breakdown by product within equipment sales, they reported it on earnings calls. For example, on the second quarter 2024 earnings call held on February 5, 2024, and third quarter 2024 earnings call held on May 6, 2024, Defendant Soloway stated "[l]ocking sales once again represented 61% of hardware sales in Q2" and "locking sales once again represented over 60% of hardware sales in Q3[,]" respectively. Similarly, on the fourth quarter

2024 earnings call, held on August 26, 2024, Defendant Buchel stated, that locking sales accounted for "65% of our total hardware sales, equipment sales."

45. Defendants also emphasized that a favorable product mix weighted toward locking products is essential for achieving the Company's overall margin goals. For instance, Defendant Buchel noted on February 3, 2025 that "[l]ocking has to be a key part of the mix... Locking has margins in the 35% to 40% range."

46. Recurring monthly revenue is derived from monitoring services provided to customers on a month-to-month basis for a monthly fee. For example, within the intrusion and fire alarm segment (also referred to as the fire and security alarm segment or division) of its business, Napco sells StarLink Fire radios, and other radios, which report to a central station if a fire alarm is activated. While the Company emphasizes the high margins of its RMR (often exceeding 90%), these revenues are dependent upon the sale of the underlying equipment, and thus equipment sales remain the bedrock of Napco's business and future growth.

47. On the first fiscal quarter 2025 earnings call, held on November 4, 2024, Defendant Buchel described StarLink Fire radio sales as "strong" but "have a significantly lower gross margin than door locking products, but, of course, ultimately lead to increases in our recurring revenue business."

48. In October of 2023, Napco introduced a new product within the fire and security alarm segment called Prima, which is an all-in-one wireless security system for use in the residential and small business markets. Once activated, Prima has built-in recurring revenue, which was very important for Napco to reach its 2026 recurring revenue goals. On the November 6, 2023 earnings call, Defendant Soloway referred to Prima as "a new high-volume small business residential burglar fire alarm…which could generate substantial growth in hardware sales and

profits and most importantly, add substantial recurring revenue service to NAPCO." CW4 also confirmed that Napco had placed high hopes in Prima stating that it was an "emerging shining star within the company[.]" Further, CW4 said Napco put a lot of weight on Prima, especially to bring in the recurring revenue.

49. In November 2024, Napco added another product called MVP Access, a cloud-based locking product, to its Access Pro division, which sells locking products. When Defendant Soloway announced MVP Access on the first fiscal quarter 2025 earnings call held on November 4, 2024, he described it as a "new growth opportunity" and touted its potential to generate hardware sales and recurring revenue:

> A new growth opportunity in commercial locking and access control is our long-awaited MVP hosted access system, which could generate substantial hardware sales and recurring revenue for both the installing dealer and for NAPCO. This new innovative IP technology systems enables wireless cloud access for end users of the system.

50. Defendant Soloway further described MVP as "unique and very special" and promised it "will also generate a lot of recurring revenue for us over the years as it becomes a standard in the industry."

**B. <u>Defendants Set Aggressive FY2026 Growth Targets Dependent on Equipment Sales</u>**

51. Around 2018, telecom companies introduced 5G service, prompting them to completely discontinue 3G services by 2022. The 3G sunset rendered other communication devices, such as fire and burglar alarms that relied on these 3G cellular communicators, obsolete.

52. Thus, the 3G sunset was a major growth driver for Napco's StarLink Fire radio sales because every commercial building with a 3G radio needed to update their products all at once. There was a surge in demand for Napco's StarLink Fire radios as distributors stocked up on Napco products.

53. At the time, Napco benefitted from the 3G sunset more than its competitors because Napco had a better product, more competitive price and enough supply. For example, according to the Fuzzy Panda Report, Napco had dual sim cards that could utilize either the AT&T or Verizon markets, which was a very valuable feature for installers. Since then, competitors have caught up on those advantages, and now most also offer a dual sim radio.

54. After exploding with success from the 3G sunset, Napco management established and repeatedly reaffirmed highly aggressive long-term financial targets for the end of fiscal year 2026. The FY2026 Targets included: (a) total revenues of $300 million; (b) a revenue split of 50/50 between equipment sales ($150 million) and recurring revenue ($150 million); and (c) adjusted EBITDA margins in the mid-40% range.

55. Defendants frequently detailed the assumptions underlying these targets. As Buchel explained, the pathway to the FY2026 Targets required two critical components related to equipment sales: (i) a consistent year-over-year growth rate of approximately 10% in equipment sales; and (ii) gross margins on equipment sales "in the 30s" (i.e., above 30%).

56. The FY2026 Targets were highly material to investors and were a central theme in the Company's communications and analyst coverage throughout the Class Period. They underpinned the bullish investment thesis for Napco and supported its premium stock valuation. For instance, on the Fiscal Q3 2024 earnings call held on May 6, 2024, Defendant Soloway affirmed that Napco was "well on our way to achieving our adjusted EBITDA margin target of approximately 45% on or about the end of fiscal 2026 as our targeted equipment sales reached $150 million and our recurring revenue service level reaches $150 million."

57. Analysts, likewise, considered the FY2026 Targets material. For example, an analyst for Craig-Hallum Capital Group wrote in its February 5, 2024 report that "[w]e are

reiterating our Buy rating and increasing our price target to $50 based on an 18x EV/EBITDA multiple on our FY'26 estimate of $98.7M. We believe the prospects of the FY26 targets being achievable will improve meaningfully over the next couple quarters."

### C. **Defendants Admit They Closely Tracked and Reviewed Granular Distributor and End-User Demand and Sales Data From "Sell-Through" Data They Received Directly from Distributors**

58. Defendants repeatedly assured the market that they possessed sophisticated data that provided them with clear, real-time insight into the health of the distribution channel. This visibility allegedly allowed Defendants to distinguish between actual end-user demand and fluctuations in distributor inventory. Defendants stated that the cornerstone of this visibility was the monitoring of "sell-through" data.

59. Sell-through refers to the rate at which distributors sell Napco products out of their inventory to downstream dealers and installers. By comparing Napco's sales *into* the distributor (sell-in) with the distributor's sales *out* (sell-through) to end customers, Defendants claimed they could accurately assess whether inventory was building up or being depleted in the channel.

60. Defendants emphasized the critical importance of this data. As Defendant Buchel stated on the fiscal third quarter 2025 earnings call held on May 5, 2025, "sell-through stats" are Napco's "key stat to look at because that's the vibrancy of the business. That shows what our distributors are selling of our product to dealers. It's the dealers that's the key."

61. Defendants did not merely claim that this data existed; they claimed to monitor it closely and rely upon it. Defendant Buchel stated on the second quarter 2024 earnings call, held on February 5, 2024, that "the sell-through stats with locking continue to do well. ***We watch all these stats every week, every month. We watch the inventory levels for all of our distributors***." (Emphasis added). In an even more direct admission of his contemporaneous knowledge, Buchel

asserted during the November 4, 2024 earnings call that "***I see the sell through stats. I see their inventory level***." (Emphasis added).

62. CW2, who worked in the fire and security alarm segment during the Class Period, reported that throughout CW2's tenure, CW2 received and reviewed sell-through data for CW2's division from distributors in a Point-of-Sale Report ("POS Reports") sent via an attachment to an email. CW2 said that, as part of their contract obligations with Napco, distributors emailed the POS Reports to CW2, Spinelli, Buchel, and others in executive leadership at Napco on a monthly basis. According to CW2, the POS Reports broke down the sell-through numbers based on the distributor's different regions.

63. Contrary to what Defendants told investors, CW2 confirmed the POS Reports showed that the distributors were experiencing declining sales of Napco products throughout the Class Period. CW2 further confirmed that the POS Reports were saved, reviewed, and aggregated by Napco and used to do historical analysis for sales trends going back "2, 3, 4 years." Additionally, the commissions for salespeople were based on numbers from the POS Reports.

64. Defendants' admitted access to, and review of, sell-through data, along with CW2's corroboration, renders implausible any suggestion that Defendants were unaware of the magnitude and prolonged nature of the destocking crisis that began in July 2024 that continued throughout the Class Period.

### D. Immediately Prior to and Throughout the Class Period, Napco's Failure to Keep Up with Technology Causes it to Lose Sales and Market Share to Competitors

#### 1. Napco's Lack of Technological Innovation Made Its Products Obsolete

65. According to CW1, prior to and throughout the Class Period, Napco products were old, outdated and the tech was "not intuitive" like most of the competing products. Thus, CW1 reported, the competition was far ahead of Napco because they had improved their tech.

66. For example, CW1 said that most of Napco's burglary panels are not touch screens but rather old-style keypads—"the same keypads they've been using since the early 2000s. They added a blue light. That's it." CW1 also noted that, throughout the Class Period, Napco's equipment required old school installation and learning how to operate it was not a simple process because customers must read detailed manuals to understand the features and functionality of Napco's products.

67. In comparison, CW1 said competing products are easier to install, easier to program, usually with quick, online account access, and operation is simple and essentially self-explanatory. For example, CW1 said competitor products conveniently allow installers to "do it on a touch screen – boom, boom, boom and they are done," whereas Napco products required punching codes into the keypads and other complicated steps to program the systems. CW1 had to learn programming techniques done by phone operators in the 1980s to install and operate Napco products. CW1 also noted that competitor products that have more modern, intuitive functionality do not receive as many calls to tech support because the ease of using the product makes dealing with it almost self-explanatory.

68. CW1 said the general attitude at Napco during CW1's tenure was that "if it works, why change it." CW1 stated that Napco's lack of technological innovation caused its products to become obsolete. CW1 reported that product integrators, which design and install electronic security systems, refused to use Napco products because they are "too out of date." CW1 said distributors were destocking Napco products throughout the Class Period "because nobody is buying something that's too difficult to set up and takes too long."

69. CW1 further stated that when Napco finally released the MVP locking product with cloud software in November 2024, it did not feel exciting because competitors had already been using the cloud in their products for several years.

### 2. Sales Were Declining in the Access Pro Division Due to a Lack of Innovation and Failure to Compete Technologically

70. CW3 was hired to work in the Access Pro division, formerly known as the Continental Division. During CW3's tenure, the Company named Aaron Black the new VP of Sales for the Continental Division and, with much fanfare, changed the name of the division to Access Pro.

71. The Access Pro division focused on selling electronic locks and access systems. The division primarily sold two core locking products: Continental and Continental E-Access. CW3 said the product this witness sold was very old and antiquated and CW3 struggled with it because the product was not updated, particularly the software. CW3 said it just did not look up-to-date for what customers wanted. As a result, CW3 said that throughout the Class Period, the demand for installing a new locking system from the Access Pro division was weak because the product was outdated and ugly.

72. CW3 spoke to Aaron Black, VP of Sales for Access Pro, about the outdated look of Napco products and the need to update the products to stay competitive. CW3 also voiced CW3's concerns with a senior software engineer for Access Pro at a security product convention. The engineer responded, "what's wrong with ours?" CW3 suggested that the engineer walk around and look at competitor products to understand their updated appearance and functionality and compare them with Napco's outdated products and the engineer responded, "it works, doesn't it?" CW3 recalled that the engineer did not want to look at anyone else's products.

73. CW3 said, "everyone on the Access Pro side…we were all aware this stuff needed to be updated," and they all discussed that fact with their management. "It was an ongoing thing," CW3 said.

74. CW3 noted that the overall sales in Access Pro appeared to start decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 knew this from receiving sales reports for the Access Pro division which showed numbers for CW3's region and the other regions' sales numbers declining. Black also told CW3 and other salespeople their sales numbers were declining.

75. CW3 said the Company used a Microsoft 365 Office software for its Customer Relationship Management system to track KPIs, including the activities of salespeople, such as calls, customer meetings and emails.

76. CW5 also worked in the Access Pro division. CW5's customers were "channel partners" and "integrators" who install locking and full-security systems for end-users. These customers were different than the large distributors who were the direct customers for Napco's other products. CW5 stated that once CW5 started selling Napco's Access Pro products, it was quickly discovered that CW5 could not make the sales targets that the Company set.

77. When CW5 began to reach out to customers, CW5 was disappointed to learn that "[t]he demand was lower than I expected it to be." The only customers buying Napco's products were existing customers who were adding on to their current Napco systems. For example, when a business that had 10 locations added a new location. Customers in the "greenfield" space, which involves new building construction or a new business installing a security system for the first time, were not interested in Napco's Access Pro products. "They would not choose Napco," CW5 said.

78. According to CW5, throughout CW5's tenure, Napco was losing customer demand due to a lack of innovation and failure to keep up with the competition technologically. Products like the Ring doorbell camera and other similar products had pushed the security industry forward into a cloud-based service and away from a reliance on clunky, siloed hardware that was installed on-premises. During CW5's tenure at Napco, the Company still had not released a cloud-based service for its Access Pro products, which is what customers wanted. CW5 said, "Napco missed the boat on cloud-based. There are already several major players."

79. CW5 noted that consumers and the wider market have come to expect their products to work within the cloud and to be able to integrate with other cloud-based products. They do not want to deal with expensive, hard-wired, on-premises equipment that needs its own server and cannot be operated remotely from their phones. Yet, Napco had not kept up with that shift in the market, failing to offer cloud-based products until recently, and failed to offer products that integrated with other products.

80. Prior to CW5 arriving at Napco, the Company had announced it was going to release a cloud-based locking product called MVP. However, that release had been delayed multiple times. "Napco had been touting, 'it's about to be here,' but it was delayed and delayed and delayed," CW5 said. According to CW5, there were times when a large customer order was ready to go if the cloud-based product had been available, but those did not happen because the MVP was so delayed.

81. CW5 had conversations with Aaron Black, VP of Sales for Access Pro, who was pushing Napco to hurry up the release of the MVP cloud-based product. CW5 recalled that Black was really trying to push the cloud offering and was pushing leadership and engineering, saying, "guys, you have to get this done. We are behind on this." CW5 recalls that Black mentioned talking

to and urging Spinelli to do what he could to speed up the release of MVP. "I got the very strong sense he knew there was an urgency," CW5 said of Spinelli.

82. When Napco's MVP cloud-based locking software was finally released in November 2024 after multiple delays, CW3 described MVP merely as a "wrapper" for the already existing software. It only appeared to have updated software, but once a user "clicked on any button, it went back to looking like the old stuff."

83. Unfortunately, the debut of the MVP system was too little too late because, by this time, Napco was already experiencing significant declines in equipment sales, which would only worsen over the next quarters.

### 3. Sales Were Declining in the Fire and Security Alarm Division Because Napco Did Not Offer the Modern Features and Technology that Consumers Wanted

84. At the time CW2 was named Vice President of Sales for Napco's fire and security alarm division in April 2023, sales were in decline. "It was already a mess," CW2 said. After CW2 took over the division, the sales stayed in decline despite CW2's efforts, which included securing a new relationship with the world's largest security equipment distributor, ADI.

85. The feedback CW2 personally received from customers made it clear to CW2 that Napco's sales were in decline because its products were not keeping up with the competition technologically. CW2 explained that one of the biggest issues with Napco's fire and security systems was that Napco did not offer a cloud-based product during CW2's tenure. Thus, throughout CW2's tenure in the fire and security alarm division, customers who had previously been strong buyers of Napco products were switching to competitors, telling the sales representatives that Napco products simply did not offer the modern features and technology that consumers wanted. According to CW2, "at the end of the day, Napco was not keeping up with the market, and not keeping pace with how fast the market was changing. There was no ability from

Napco to develop new products." CW2 said that customers often asked if Napco was going to upgrade its products, and said the Company lost sales for not upgrading its products.

86. CW2 reported that sales "were down the entire time" during CW2's tenure, estimating sales were down approximately 25% during CW2's tenure in the fire and security alarm division.

87. Additionally, Napco's largest competitor, M2M, had formed a partnership with Honeywell, which cornered about 70 percent of the fire alarm system market. CW2 confirmed that Napco lost sales due to M2M's partnership with Honeywell, which provided "very good market presence. Honeywell had a market presence that is very difficult to compete with."

88. During CW2's tenure in the fire and security division, CW2 had weekly sales meetings with Senior Vice President Stephen Spinelli to report sales numbers, broken down by distributor, which showed sales steadily declining. CW2 said Napco's declining sales was discussed at every weekly sales meeting during CW2's tenure.

89. CW2 reported that there were a number of Napco executives that attended the weekly sales meetings, including Spinelli and Defendant Buchel, and that Spinelli and Buchel expressed concern about the declining sales numbers during the weekly sales meetings. Thus, CW2 confirmed, Spinelli and Buchel knew sales were declining during CW2's tenure in the fire and security division. "Especially in the last year, everyone was concerned, and they discussed what to do about it at every meeting. But no one came up with a real solution to the problem."

90. Additionally, CW2 spoke with Spinelli on a daily basis about the lack of sales and dropping demand for Napco products. Spinelli told CW2 that Spinelli reported the declining sales numbers to Defendants Soloway and Buchel.

91. CW2 and others urged Spinelli and the head of engineering, Michael Carrieri, to focus more on innovating Napco's products to keep up with competitors and where the market was going technologically in the security industry.

92. CW2 recalled that the need for innovation was also discussed at the weekly sales meetings with Buchel and others.

93. Although CW3 worked in the Access Pro division, CW3 spoke with salespeople in fire and security and recalled that "a lot of them said sales were down[.]" CW3 reported talking with a salesperson in Texas who said sales were way down in fire and security.

### 4. Sales Were Declining in the Inside Sales Division

94. CW6 further corroborated that sales were declining in the Inside Sales Division where CW6 worked during the second half of CW6's tenure (approximately August 2024-April 2025). As an Inside Sales Specialist, CW6 received orders placed by customers, such as distributors, including ADI and Wesco, in addition to outside sales representatives who worked with distributors. Customers placed orders by sending invoices to a department email inbox, from which an Inside Sales Specialist opened the invoice and entered the information into AS4000, the Company's order processing software system. Almost everyone in the administrative office at the Amityville headquarters had access to the AS4000 system. CW6 predominantly processed orders of Prima, Gemini, and other Napco products, but sometimes processed Marks and Alarm Lock products.

95. Early in CW6's tenure, CW6 saw many orders come in each day, especially from the large distributors, like ADI and Wesco, who had several locations throughout the United States, so their orders for new units came in multiple times per day from their different locations. But as time went on, and towards the second half of CW6's tenure (approximately August 2024-April

2025), the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day."

96. Due to the decline in sales, CW6's monthly commission check based on sales of products began to shrink. "Over time, the commission checks were going down by $100 to $200 every now and then." When CW6 first started at Napco, a typical commission check was about $700 to $900. But in the second half of CW6's tenure, the checks dropped to about $400 to $600, and sometimes as low as $300.

97. As a result of declining sales numbers, CW6's two managers, Crews and Azima, pushed the inside sales representatives to make calls to customers to place new or additional orders, often at the end of a quarter. The goal, CW6 said, was to "try to get sales boosted." Napco provided the inside sales representatives with a script which included discounts or incentives approved by higher level employees at Napco to read to customers during these calls.

98. In the second half of CW6's tenure, when sales were declining, CW6 confirmed that large influxes of orders were placed at the end of quarters. CW6 noticed this in the fall of 2024 after the commission checks started to shrink. The end of the quarter orders would "skyrocket" increasing "more than double" CW6 reported. According to CW6, Napco offered distributors like ADI and Wesco incentive discounts to place orders at the end of quarters. Additionally, certain products, such as Prima, were discounted more as an incentive for customers to buy more units. According to CW6, the end of quarter discounts would already be programmed into the software system so that when the customer placed the order, the discount would automatically be applied.

99. In addition to the declining orders, in January and February 2025, the volume of returns that the inside sales team had to process increased significantly. "Returns were going up." Because the volume of returns was increasing so much, CW6 was asked to help process the returns.

CW6 observed that returns were coming in from a mix of customers, and a mix of products, but noted that they were receiving "a lot" of Prima returns.

### E. Throughout the Class Period, Napco's Three Largest Distributors Were Significantly Destocking Napco Products as Customer Demand Fell

100. The Company's largest distributor clients are ADI and Wesco. ADI was added as new distributor for Napco in mid-2023. According to Defendant Buchel on the third quarter 2024 earnings call held on May 6, 2024, ADI is "the largest distributor of security products in the industry." Defendant Buchel also stated that ADI introduced Napco to Securitas, "the second largest dealer out there" and "thanks to ADI" Napco now has a relationship with Securitas. These entities comprise the overwhelming majority of Napco's equipment sales pipeline. Thus, Napco's relationships with its distributors are very important.

101. The concentration of sales through these key distributors renders Napco highly vulnerable to changes in their purchasing behavior and inventory management strategies. If one or more of these distributors decide to reduce their inventory levels (destock), the impact on Napco's revenue is immediate and significant.

102. Because these distributor relationships are vital, the Individual Defendants are closely involved in managing them, including frequent communication with distributor management. As detailed herein, Defendant Buchel specifically claimed to have direct conversations with the "President" of one of their largest locking distributor regarding inventory issues.

103. Around mid-2024, Napco's largest distributors began a concerted effort to reduce their inventory levels and cut back on Napco products (destocking). This had a direct and immediate impact on Napco sales. In the first quarter of Fiscal Year 2025 (July 1, 2024 - September 30, 2024), Napco began to experience a significant deceleration in orders from its key distributors.

104. During the earnings call discussing Napco's Fiscal Q1 2025 financial results held on November 4, 2024, (the "Q1 2025 Earnings Call") Defendants reported lower equipment sales and attributed the decrease to a ***one-time event*** where the distributors needed to "temporarily lower their inventory levels". Defendant Buchel stated, "And this, we believe, is temporary, unlike the radios that were in the channel, which lasted several quarters. This is different." Defendant Buchel further told investors, "[d]on't take what happened in one quarter as being the new norm…This is just one quarter." According to Defendant Buchel, he "spoke to our largest distributor of locking products…Spoke to the President, we spoke at length. He ***assured me this is just a temporary 1-quarter event***" and confirmed that Buchel knew this because "[w]e can see from their inventory levels, we can see from the sell-through [data]."

105. However, this was anything but a "temporary" event. Indeed, CW2 confirmed that Wesco and ADI were ordering less products and returning products while CW2 was in the fire and security division and it continued even after CW2 left. CW2 said it was mix of multiple products that were impacted, but Prima was a significant one.

106. Defendants were aware of the returns of products because, according to CW2, Napco "cannot accept a return without Buchel's approval." Defendants were also aware of declining equipment sales in real-time because they admittedly monitored distributor "sell-through stats" and "inventory levels." According to CW2, the sell-through data was emailed to CW2, Spinelli, Buchel, and others in leadership at Napco and showed that the distributors were experiencing declining sales of Napco products.

107. The data available to Defendants demonstrated that the inventory glut was substantial and that the destocking process required to normalize levels would take several quarters to complete.

### F. **As Napco was "Struggling" to Sell Prima, Defendants Began Offering Undisclosed Rights of Return on Prima to Boost Sales**

108. Napco launched its new Prima product (within the fire and security alarm segment) in October 2023. Prima was purportedly an all-in-one wireless alarm panel system launched to ignite the Company's sales. Prima was not a product for large commercial sites but was more geared for residential and smaller professional and retail spaces.

109. At the time of Prima's launch, several accessories for the product were not available, which negatively impacted early sales. In fact, as Defendant Buchel later admitted on the Q1 2025 Earnings Call on November 4, 2024, unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

110. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

111. CW4 was hired in Fiscal Q2 2025 to help with the Company's poor sales performance as Napco launched Prima and focused on selling it to dealers. CW4 confirmed that Prima was Spinelli's "baby" and the Company had placed very high hopes on its prospects. "I think they saw Prima as being kind of the emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue," CW4 said. However, even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

112. CW4 heard from Spinelli and Jim Pless throughout the course of CW4's entire time at Napco about disappointing Prima sales. Within two months of being hired, CW4 became aware of the obstacle to Prima sales based on conversations CW4 had with dealers. The problem with Prima, according to CW4, is that Prima used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals to alarm dispatch centers, who then passed on the alerts to fire and police departments. CW4 said Alarm.com has a near monopoly on the alarm signal processing for alarm systems, and that customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com. CW4 said this was a "huge, very, very big" obstacle to the sales of Prima.

113. CW4 provided feedback to Jim Pless, Director of Sales, and Spinelli about the obstacle CW4 faced with dealers regarding Prima not using Alarm.com. Pless and Spinelli indicated they were aware of the obstacle. "It was more of a confirmation of what they already knew. They'd say, 'Yep, we are getting the same thing.'"

114. CW7 corroborated CW4's account, reporting that when CW7 joined Napco in August 2024, Prima sales were "struggling" and Napco was missing its own internal sales targets. According to CW7, Prima sales were below target throughout CW7's tenure (*i.e.*, August 2024 through December 2025).

115. CW7 said sales personnel were told to find dealers that would purchase 100 plus Prima panels per month but they could only find dealers willing to purchase five to ten units per month because customers were not buying Prima.

116. CW7 confirmed that Napco was not selling Prima panels because they were outdated and lacked features customers wanted and could get from competitor products. For

example, CW7 said Prima lacked a secondary keypad and could not interface with multiple users. Moreover, updates took nearly one hour to complete and there was no installer app.

117. According to CW7, customers told CW7 they did not want to buy Prima because it was not ready and not up to date.

118. CW7 recalled that even after Napco applied over 700 updates in January or February 2025, the Prima panel was still behind the competition.

119. CW7 discussed struggling Prima sales with Jim Pless and Spinelli all the time when CW7 reported to them. CW7 also participated in weekly sales meetings from approximately August 2024 until January or February 2025 attended by all Napco salespeople and Jim Pless, with Spinelli attending some of them. During the weekly meetings, CW7 recalled, the sales representatives discussed the pipeline of upcoming sales, but the Prima team never had good numbers to report. From January/February 2025 onward, CW7 attended monthly sales meetings until some point later in 2025, when CW7 stopped attending the monthly sales meetings.

120. CW7 understood from CW7's frequent conversations with Pless and Spinelli that Pless and Spinelli told Defendants Buchel and Soloway that Prima sales were struggling and continued to miss internal targets.

121. In or around January or February 2025, CW4 learned during a call with other salespeople that ADI was asking to return about $1 million worth of Prima kits. "They wanted to return it because it sat on the shelves for over a year." On the sales call, CW4 opposed the idea of accepting the return of so much product. But Napco agreed to accept the return. After that sales call, CW4 discussed the ADI return with Pless.

122. CW7 corroborated CW4's account, confirming that in early 2025, during a sales meeting, it was discussed that one of Napco's large distributors, who CW7 believed was ADI,

returned a significant portion of Prima panels as part of this distributor's destocking of Napco products because Prima was not selling off the distributor shelves. CW7 learned this from attendance at Napco's weekly sales meetings and at product shows during CW7's tenure.

123. By about the end of April 2025, the Company was no longer providing much in resources for CW4's efforts to sell Prima. For example, despite asking multiple times, CW4 was unable to obtain more than one demo kit of the Prima panel to leave behind with potential customers to test out. CW4 further said Napco would not cover expenses to travel for a large sales opportunity in July 2025.

### G. <u>Napco Concealed Declining Sales by Falsely Touting Increased Recurring Revenues</u>

124. In addition to equipment sales, Napco generated revenues from its "recurring revenue business in which customers who purchased [Napco] products and equipment are required to pay monthly fees for communications services to maintain operation of such products." Napco's recurring revenue business included products such as StarLink, MVP, iSecure, and iBridge.

125. Throughout the Class Period, Defendants emphasized the supposed strength and predictability of Napco's recurring service revenues. For example, in Napco's Fiscal Year 2024 Form 10-K filed on August 29, 2024 for the year ended June 30, 2024 ("2024 10-K"), Defendants asserted that "[t]he increase in our net sales from fiscal 2023 to 2024 was driven primarily from the continued growth of our recurring services revenues" and "[t]he increase in net income during fiscal 2024 was due primarily to the growth of the recurring service revenues which generated a gross margin of 90% during the period."

126. Defendants further touted in the 2024 10-K that RSRs "have grown significantly over the past several years, increasing 65% from fiscal 2022 to fiscal 2024" and stated that "[t]he Company's long-term goal is to have revenues from these recurring services represent at least 50%

of total revenue." Napco's 2024 10-K also assured investors that RSRs provided the Company with a "predictable stream of income" that "mitigates the risk of fluctuation in market demand for our equipment products."

127. Thus, this high-margin revenue stream of RSRs, derived primarily from monitoring and service fees for Napco's radios, was the cornerstone of the Company's investment thesis. Defendants repeatedly highlighted RSR's impressive growth rate, which purportedly averaged approximately 26% growth year-over-year during each quarter of fiscal year 2024, presenting it as a real-time indicator of the Company's robust health, market penetration, and superior business model.

128. In truth, and as Defendants knew but failed to disclose, there was a significant and variable "lag" between when Napco booked revenue for a hardware sale and when it could begin recognizing the associated high-margin recurring service revenue from that same unit. This lag, which Defendants knew from internal data, ranged from six to eighteen months.

129. This lag was caused by a multi-step process: (a) first, Napco sells its equipment to a third-party distributor, at which point Napco recognizes its "equipment sales" revenue; (b) second, that distributor sells the radio to a dealer or installer at an undisclosed time; (c) third, the dealer must schedule and perform the physical installation at a customer's location; (d) fourth, as an inducement to purchase, Napco admittedly offered "a few months of free service" for new equipment, further pushing the date of first paid recurring service revenue far into the future; and (e) fifth, Napco could install the software and begin recognizing monthly RSR.

130. The direct and material consequence of this six-to-eighteen-month lag is that the "recurring service revenue" growth reported in any given quarter was not a reflection of ***current***-quarter product demand or sales performance. Rather, it was a "look-back" metric, reflecting the

results of a pipeline of radio sales that had occurred two, three, four, or even six quarters prior. The 26% growth rate touted in fiscal 2024, for example, was the result of hardware sales made largely in fiscal 2023 and even late 2022 (likely more attributable to the 3G sunset), not a real-time indicator of demand during fiscal 2024.

131. This structural disconnect rendered Defendants' continuous representations regarding recurring revenue growth materially false and misleading. For an investor to properly assess the sustainability of this growth, they need the single most important leading indicator: the number of radios sold to end users in the current quarter. Current-quarter radio sales to distributors represented the pipeline that would feed recurring revenue 15 to 18 months down the line. A significant slowdown in radio sales to distributors today would result in a severe deceleration or collapse in recurring revenue growth in future periods.

132. Defendants, however, concealed this critical metric from investors. Instead, the Company intentionally obscured this data by burying it within Napco's broad "equipment sales" reporting segment. This accounting gimmick created an informational "black box" that made it impossible for investors to perform a fundamental analysis of the Company's most important value driver. Thus, investors were forced to rely solely on Defendants' misleading narrative that the reported 26% RSR growth was robust and sustainable, all while Defendants possessed contrary, non-public data— current radio sales during the Class Period were declining and would result in declining recurring revenue in the following six to eighteen months.

133. In fact, a former senior Napco employee cited in the Fuzzy Panda Report confirmed the running "joke" inside of Napco was that executives would have an 18-month "head start" on selling stock due to the lag in RSR. The former employee stated: "I used to tell Dick, [Napco's CEO]... we'll have a good head start to run out of here. When the units go down, you'll know that

15 months from now recurring is going down... Now I call it a year and a half." In other words, insiders at Napco would have an 18-month head start on the market with knowledge of when to sell stock because they could see ahead of time if and when the Company would perform poorly in the future.

134. Indeed, as demonstrated in Figure 2 and Figure 3, below, throughout fiscal 2022, year-over-year revenue growth rates averaged 35% and 36% for *both* the Intrusion and Access Alarms segment (*i.e.*, equipment) and the Services segment, respectively. But in FQ4 of 2023, revenues from the Intrusion and Access Alarm segment declined and remained depressed for six quarters before the Services segment finally experienced a corresponding decline, falling from a 22% growth rate in FQ1 2025 to just 14% in FQ2, and falling even further in FQ3 and FQ4 2025.

**Figure 2.**[2]

| | 2022 | | | | 2023 | | | | 2024 | | | | 2025 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue Segment | FQ1 | FQ2 | FQ3 | FQ4 | FQ1 | FQ2 | FQ3 | FQ4 | FQ1 | **FQ2** | **FQ3** | **FQ4** | **FQ1** | **FQ2** | FQ3 | FQ4 |
| Intrusion and Access Alarms | 34% | 31% | 41% | 33% | 38% | 5% | -9% | -33% | -31% | **-1%** | **-12%** | **-21%** | **-3%** | **-33%** | -21% | -3% |
| Services | 41% | 35% | 35% | 33% | 35% | 35% | 26% | 27% | 25% | **25%** | **29%** | **27%** | **22%** | **14%** | 11% | 10% |

[2] In Figure 2, black bolded text indicates financial results reported within the Class Period; red bolded text indicates the financial results announced at the end of the Class Period.

**Figure 3.**




135. Defendants' false narrative and concealment of declining sales, while falsely touting RSR gave investors the false impression sales were stable and the purported distributor destocking was temporary when it was not.

## V. MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS[3]

136. Throughout the Class Period, Defendants made materially false and misleading statements and omitted material facts concerning the nature and duration of the inventory

[3] Statements alleged to be false and misleading are bolded and underlined. All other statements are provided for context.

destocking by the Company's key distributors and the achievability of the Company's FY2026 Targets given the declining demand for, and sales of, Napco's outdated products.

### A. February 5, 2024 Press Release and Earnings Call

137. On February 5, 2024, Defendants issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC and signed by Defendant Buchel reporting Napco's Fiscal Q2 2024 financial results (the "Q2 2024 Press Release") for the period ended December 31, 2023. In the Q2 2024 Press Release, Napco describes itself as having a reputation for "innovation" and "technical excellence":

> **NAPCO products have earned a reputation for innovation, technical excellence and reliability, positioning the Company for growth in the multi-billion dollar and rapidly expanding electronic security market**.

138. The same sentence was repeated in several of Napco's press releases, attached as Exhibit 99.1 to Forms 8-K filed with SEC and each signed by Defendant Buchel on March 7, 2024, May 6, 2024, August 26, 2024, November 4, 2024, and on February 3, 2025. The same (or substantially similar) false and misleading language was repeated in news releases posted to the news section of Napco's investor relations website [4] and its press room section on its product website[5] on the following dates:

- News releases: January 16, 2024, January 31, 2024, February 5, 2024, March 5, 2024, March 5, 2024, March 12, 2024, April 2, 2024, May 1, 2024, May 2, 2024, May 6, 2024, June 20, 2024, August 26, 2024, September 17, 2024, October 30, 2024, November 4, 2024, November 6, 2024, November 25, 2024, December 2, 2024, December 16, 2024, January 29, 2025, and February 3, 2025.

[4] https://investor.napcosecurity.com/news-releases?l=100 (last accessed May 11, 2026).
[5] https://napcosecurity.com/news/ (last accessed May 11, 2026).

- Press Room: May 1, 2024, May 2, 2024, May 2, 2024, June 3, 2024, July 11, 2024, July 30, 2024, January 7, 2025, and January 27, 2025.

139. These statements in the press releases and news articles were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because it gave the false impression that Napco products were innovative with modern functionality and Napco was well "position[ed] . . . for growth" based on the Company's "innovation" and "technical excellence" when in reality, by the time each of these misstatements were made, Napco customers were already complaining about Napco products being outdated and technologically inferior to competitor's products, which was resulting in declining sales due to obsolete technology, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, the tech was "not intuitive" like most of the competition, and Napco's lack of technological innovation caused its products to become obsolete, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco products.

b. CW2, who worked in the fire and security alarm division between April 2023 and April 2024, personally received feedback from customers during CW2's tenure that Napco's products were not keeping up with the competition technologically because, among other reasons, Napco's fire and security systems did not offer a cloud-based product during CW2's tenure. As a result, customers were switching to competitors, telling the sales representatives that Napco products simply did not offer the modern features and technology that consumers wanted. According to CW2, "at the end of the day, Napco was not keeping up with the market, and not keeping pace with how fast the market was changing. There was no ability from Napco to develop new products."

c. CW3 worked in the Access Pro division before the Class Period until July 2024 and reported struggling with the locking product during CW3's tenure because it was "very old and antiquated," the software was not updated, and "[i]t just didn't look up-to-date for what customers wanted." CW3 said that throughout CW3's tenure, the demand for installing a new locking system from the Access Pro division was weak because the product was "outdated" and "ugly." According to CW3, when Napco did upgrade to its MVP product, it was merely a "wrapper" for the already

existing software and only appeared to have updated software, but once a user "clicked on any button, it went back to looking like the old stuff."

d. Throughout CW5's tenure (September 2024 through November 2024), Napco was losing sales due to a lack of innovation and failure to keep up with the competition technologically, including, failing to timely offer cloud-based and integrated products

e. CW4 was hired in Fiscal Q2 2025 to help with the poor sales performance of Prima and noticed within two months of being hired that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

f. CW4 heard that the accessories for Prima were not available for purchase at the time of launch (October 2023), which likely contributed to Prima's lack of sales.

g. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

h. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts prior to and throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

i. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

j. As a result of the above, CWs 2-7 all reported Napco's sales for all its products were steadily declining throughout the Class Period.

140. On February 5, 2024, Defendants held an earnings call to discuss the Fiscal Q2 2024 financial results (the "Q2 2024 Earnings Call"). In his prepared remarks, Defendant Soloway stated he was "particularly pleased to see the <u>**growth in equipment revenues, which was**</u>

**primarily attributable to the continued strength of locking revenue in addition to the improvement in intrusion sales**."

141. During the question and answer session of the Q2 2024 Earnings Call, analyst Bennett asked whether there "were there any changes in demand in that business" on "the locking side of the business" that had purportedly generated 10% growth, to which Defendant Buchel affirmatively stated there was "**nothing**" and led the market to expect continued growth at or above those levels:

> **Chad Michael Bennett,** *Craig-Hallum Capital Group LLC*
> And then just shifting to the locking side of the business. I think you talked about locking growth of roughly 10% year over year. Just ***in terms of sell through there and demand there, were there any changes in demand in that business?***
>
> **Kevin S. Buchel**, Executive VP of Operations, Treasurer, CFO and Director
> Locking has done well for several quarters in a row, maybe last even couple of years in a row. **So nothing unusual that gave us the strength**. What's great is **we have 2 locking companies**; we have Alarm Lock and we have Marks, and **both of them are firing on all cylinders. And that's why we're seeing the success in locking. So we expect that to continue for many quarters to come**.

142. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that sales were increasing in the locking and intrusion and fire alarm divisions, when in reality, Napco was experiencing declining sales in these divisions due to outdated and obsolete technology, as evidenced by:

a. CW2 worked in the intrusion and fire alarm division and reported that when CW2 took the fire and security alarm division over in April 2023, sales were in decline and continued to decline throughout CW2's tenure, remaining "down the entire time" by approximately 25%.

b. CW2 received and reviewed sell-through data in POS Reports for CW2's division from distributors, which reported that distributors were experiencing declining sales of Napco products throughout CW2's tenure. CW2 spoke with Spinelli on a daily basis about the lack of sales and dropping demand for Napco products and Spinelli told CW2 that Spinelli reported the declining sales numbers to Defendants Soloway and Buchel.

c. According to CW3, who worked in the Access Pro division (which primarily sold locking products) before the Class Period until July 2024, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions.

d. Black also told CW3 and other salespeople their sales numbers were declining.

e. A lot of salespeople CW3 spoke with in the intrusion and fire alarm division said their sales numbers were likewise down.

143. Regarding Napco's radios, which are within the intrusion and fire alarm segment of Napco's business, Defendant Soloway claimed "**our radios are the best choice for the dealers. They have a lot of features that the dealers like**[,]" which purportedly supported Napco's overall "2026 goal of $150 million of recurring" revenue.

144. The statement in the preceding paragraph was materially false and misleading when made or omitted to state material facts necessary to make the statement not misleading because it gave the false impression that there was strong and increasing demand for Napco's radios when in reality Napco was experiencing declining sales overall in the intrusion and fire alarm segment due to outdated and obsolete technology, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products, including Napco's burglary panels (part of the fire and security alarm segment), were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they are "too out of date[,]" and distributors were destocking Napco products.

b. CW2, who oversaw the sales team for the fire and security alarm system division between April 2023 and April 2024, personally received feedback from customers throughout CW2's tenure that Napco's products were not keeping up with the competition technologically because, among other reasons, Napco's fire and security systems did not offer a cloud-based product during CW2's tenure. As a result, customers were switching to competitors, telling the sales representatives that Napco products simply did not offer the modern features and technology that consumers wanted. According to CW2, "at the end of the day, Napco was not keeping up with the market, and not keeping pace with how fast the market was changing. There was no ability from Napco to develop new products."

145. During the Q2 2024 Earnings Call, responding to analyst James Ricchiuti's question of "what kind of traction are you seeing from Prima[,]" Soloway claimed "**[t]he product is beyond anything else in the security industry with its functionality, ease of installation, goes in, in 10 minutes**." Soloway went on to distinguish Prima from other products on the market, claiming **"they're a little old fashioned that the competitors have, and this is very, very modern and installed so quickly, this will become a standard of the security industry**."

146. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Prima was an innovative product that had surpassed the competition's "old fashioned" products and would, thus, become the industry standard, when in reality, Prima sales were abysmal due to its lack of features, as evidenced by:

a. CW4, who was hired in Fiscal Q2 2025 to help with Prima's poor sales performance, noticed within two months of being hired that the problem with Prima (which was originally introduced in October 2023) was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

b. CW4 heard that the accessories for Prima were not available for purchase at the time of launch, which likely contributed to Prima's lack of sales.

c. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

d. CW4 confirmed that Prima was an "emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue[,]" and even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

e. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts prior to and throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that

Prima sales had been below internal forecasts since the product was launched in October 2023.

f. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

g. Defendants knew but failed to adequately disclose there was six to eighteen months "lag" between when Napco booked revenue for a hardware sale and when it could begin recognizing the associated high-margin recurring service revenue from that same unit. Thus, investors would not see any recurring revenue generating accounts for months or years to come.

147. Also, during the Q2 2024 Earnings Call, Defendant Soloway continued to tout strong operations and announced previous supply chain issues had been overcome, proclaiming "the constraints of the supply chain have abated" and Napco "**will begin to invigorate our equipment sales and associated margins to even higher levels than any time before**."

148. During the Q2 2024 Earnings Call, analysts queried whether the new distributor, ADI, was loading up on inventory for just the quarter or if the increase would continue into the future, to which Defendant Buchel explained that sales to ADI were not a one quarter thing and Defendants expected such sales would continue in future quarters and continue to "improve dramatically":

> **Matthew Charles Pfau** *William Blair & Company L.L.C.*
> Wanted to first ask on the new distributor that you added. Sounds like there was some impact there to hardware in the second quarter. How should we think about that going forward? Is there going to be an inflection or is this more of a slow ramp?
>
> **Kevin S. Buchel**, *Executive VP of Operations, Treasurer, CFO and Director*
> Yes. Our distributor has been around a long time, this new distributor with the 115 branches [(ADI)]. We dealt with them in the past. They're new to us now. **This wasn't a case of loading up, load up all 115 branches, get a big hit, and then things slow down. This is a more normalized ramp up. Whatever impact they had in Q1 and Q2, we expect it to improve dramatically**. They're the biggest security distributor out there. And we've only been dealing with them for a little bit of Q1 and all of Q2. So **the potential is much more than what we've seen. Again,**

> **<u>we didn't load them up. It's natural business, which is the way we want it</u>**. We don't want to get in a situation where we load them up and then they want to return it and not like that. We want sales that stick, and that's how it's going to be with these guys.

149. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statement not misleading because it gave the false impression that sales through ADI were going to improve dramatically when in reality, distributors were destocking Napco products causing equipment sales to decline, as evidenced by:

a. Throughout CW2's tenure (both before and during the Class Period), CW2 received and reviewed sell-through data in POS Reports for CW2's division from distributors, which reported that distributors were experiencing declining sales of Napco products throughout CW2's tenure.

b. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions.

c. Black also told CW3 and other salespeople their sales numbers were declining.

d. CW2 confirmed that in April 2023, when CW2 took over Napco's fire and security alarm division, sales were already in decline, and "were down the entire time" by approximately 25% during CW2's tenure.

e. CW2 spoke with Spinelli on a daily basis about the lack of sales and dropping demand for Napco products and Spinelli told CW2 that Spinelli reported the declining sales numbers to Soloway and Buchel.

f. A lot of salespeople CW3 spoke with in fire and security said their sales numbers were down.

g. Spinelli told CW4, who was hired in Fiscal Q2 2025 to help with Napco's poor sales performance, that Napco's Prima sales were not where the Company wanted them to be, and they had not had success with the product in the year since it had been released.

h. CW7, who was also hired to help with Prima's poor sales performance that had occurred since Prima was launched in October 2023, corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts prior to and throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of

a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

150. When asked by analyst Jaeson Schmidt about the "sell-through metrics" from distributors in the second quarter, Defendant Buchel claimed sell-through stats were improving, stating that "**the sell-through stats for most of the intrusion is much better than it's been**" and "**the sell-through stats with locking continue to do well**. We watch all these stats every week, every month. We watch the inventory levels for all of our distributors."

151. Analyst Rajiv Sharma asked Defendant Buchel to confirm that sell-through data was picking up, asking if it was fair to say that "[o]verall, it's up faster than what your quarterly year on year is exhibiting[,]" to which Defendant Buchel confirmed it was "**fair to say that it's up compared to what we expected. It's happening faster. And on locking, it's very good. And on intrusion, definitely up sequentially.**"

152. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that sell-through stats and, thus, sales for both the locking and intrusion and fire alarm segments, were increasing "faster" than expected and up "sequentially" when, in reality, the sell-through stats showed distributors' sales of Napco products were declining due to Napco's outdated and obsolete technology, as evidenced by:

a. Throughout CW2's tenure (both before the Class Period and during it), CW2 received and reviewed sell-through data in POS Reports for CW2's division from distributors, which reported that distributors were experiencing declining sales of Napco products throughout the CW2's tenure.

b. CW2 confirmed that in April 2023, when CW2 took over Napco's fire and security alarm division, sales were already in decline, and "were down the entire time" by approximately 25% during CW2's tenure.

c. CW2 spoke with Spinelli on a daily basis about the lack of sales and dropping demand for Napco products and Spinelli told CW2 that Spinelli reported the declining sales numbers to Soloway and Buchel.

d. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions.

e. A lot of salespeople CW3 spoke with in fire and security said their sales numbers were down.

f. CW1 said that prior to and throughout the Class Period, Napco products were old, outdated and the tech was "not intuitive" like most of the competition and product integrators refused to use Napco products because they are "too out of date."

g. CW2 personally received feedback from customers during CW2's tenure that Napco's products were not keeping up with the competition technologically because, among other reasons, Napco's fire and security systems did not offer a cloud-based product during CW2's tenure. As a result, customers were switching to competitors, telling the sales representatives that Napco products simply did not offer the modern features and technology that consumers wanted. According to CW2, "at the end of the day, Napco was not keeping up with the market, and not keeping pace with how fast the market was changing. There was no ability from Napco to develop new products."

**B. <u>February 5, 2024 10-Q</u>**

153. On February 5, 2024, Defendants filed Napco's Fiscal Q2 2024 financial results on Form 10-Q with the SEC for the period ended December 31, 2023, signed by Defendants Soloway and Buchel (the "Q2 2024 10-Q"). The Q2 2024 10-Q incorporated by reference the risk factors as set forth in the Company's Annual Report on Form 10-K for the year ended June 30, 2023 (the "2023 10-K"), which contained false and misleading risk disclosures purporting to warn that Napco's distributors ***may*** reduce their effort to sell the Company's products, which ***may*** adversely affect the Company's financial performance:

> ***We rely on distributors to sell our products and <u>an adverse change in our relationship with such distributors may adversely affect our financial performance</u>***.
>
> We distribute our products primarily through independent distributors and wholesalers of security alarm and security hardware equipment. **<u>Our distributors and wholesalers also sell our competitors' products, and if they favor our competitors' products for any reason, they may fail or reduce their effort to</u>**

> **market and sell our products as effectively or to devote resources necessary to provide effective sales, which would adversely affect our financial performance**. In addition, our distributors order our products and maintain their inventory based on forecasts of potential demands from dealers and end customers, and our distributors may not be able to forecast such demand accurately, which may adversely affect our ability to generate sales and revenue in a timely manner. In some cases, distributors may delay ordering our products until they receive confirmation of orders from dealers and end customers, and this delay may cause disruption and make it more difficult for us to fill their order timely and effectively, which may adversely affect our revenue and sales.

154. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because at the time Napco was ***already*** experiencing issues with distributors who were ***already*** destocking and reducing sales and returning large amounts of products due to Napco's outdated and obsolete products, which was ***already*** adversely impacting financial performance. As a result, the warned of risk had already occurred, as evidenced by:

a. Throughout CW2's tenure (both before the Class Period and during it), CW2 received and reviewed sell-through data in POS Reports for CW2's division from distributors, which reported that distributors were experiencing declining sales of Napco products throughout CW2's tenure.

b. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco products.

c. CW2, who worked in the fire and security alarm division between April 2023 and April 2024, personally received feedback from customers during CW2's tenure that Napco's products were not keeping up with the competition technologically because, among other reasons, Napco's fire and security systems did not offer a cloud-based product during CW2's tenure. As a result, customers were switching to competitors, telling the sales representatives that Napco products simply did not offer the modern features and technology that consumers wanted. According to CW2, "at the end of the day, Napco was not keeping up with the market, and not keeping pace with how fast the market was changing. There was no ability from Napco to develop new products."

d. CW2 confirmed that in April 2023, when CW2 took over Napco's fire and security alarm division, sales were already in decline, and "were down the entire time" by approximately 25% during CW2's tenure.

e. CW2 spoke with Spinelli on a daily basis about the lack of sales and dropping demand for Napco products and Spinelli told CW2 that Spinelli reported the declining sales numbers to Soloway and Buchel.

f. A lot of salespeople CW3 spoke with in fire and security said their sales numbers were down.

g. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions.

h. CW4, who was hired in Fiscal Q2 2025 to help with Prima's poor sales performance, noticed within two months of being hired that the problem with Prima (which was originally introduced in October 2023) was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

i. CW4 heard that the accessories for Prima were not available for purchase at the time of launch, which likely contributed to Prima's lack of sales.

j. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts prior to and throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary key pad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

k. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

155. The Q2 2024 10-Q also incorporated by reference 2023 10-K risk factors, which contained false and misleading risk disclosures purporting to warn that Napco ***may*** not be able to

introduce new products because distributors ***may*** not be willing to switch, which ***may*** adversely affect the Company's financial performance and growth:

> ***We may not [be] able to gain widespread or timely market acceptance of our new products and continue to build and enhance our brand to achieve growth***
>
> We rely on introduction of new products and services to penetrate new markets and identify additional sources of revenues order to grow our business. However, **many of our distributors and customers may not be willing to change or switch to new products and equipment, or may require an extended period time to assess, test and evaluate functionalities and performance of our new products. Any delays in establishing widespread acceptance of our new products may adversely affect our financial performance and growth**. In order to ensure market acceptance of new products, we have incurred and expect to incur significant expenses in sales and marketing campaign, and we may not be able to justify such costs if the effort does not produce sufficient sales and customer accounts.

156. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because, at the time, Napco was ***already*** experiencing issues with distributors not wanting to stock Napco's new products and were, thus, ***already*** destocking and/or returning large amounts of products because they were outdated and customers did not want them, which was ***already*** adversely impacting financial performance and growth. Moreover, Prima sales were low due to lack of functionality. As a result, the warned of risk had already materialized, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco products.

b. CW2, who worked in the fire and security alarm division between April 2023 and April 2024, personally received feedback from customers during CW2's tenure that Napco's products were not keeping up with the competition technologically because, among other reasons, Napco's fire and security systems did not offer a cloud-based product during CW2's tenure. As a result, customers were switching to competitors, telling the sales representatives that Napco products simply did not offer the modern features and technology that consumers wanted. According to CW2, "at the end of the day, Napco

was not keeping up with the market, and not keeping pace with how fast the market was changing. There was no ability from Napco to develop new products."

c. CW3, who worked in the Access Pro division (which primarily sold locking products) before the Class Period until July 2024, reported struggling with the locking product CW3 sold because it was "very old and antiquated," the software wasn't updated, and "[i]t just didn't look up-to-date for what customers wanted." CW3 said that throughout the Class Period, the demand for installing a new locking system from the Access Pro division was weak because the product was "outdated" and "ugly." According to CW3, when Napco did upgrade its MVP product, it was merely a "wrapper" for the already existing software and only appeared to have updated software, but once a user "clicked on any button, it went back to looking like the old stuff."

d. When CW2 took it over the division in April 2023, sales were already declining and continued to decline throughout CW2's tenure, remaining "down the entire time" by approximately 25%.

e. Throughout CW2's tenure, CW2 received and reviewed sell-through data in POS Reports for CW2's division from distributors, which reported that distributors were experiencing declining sales of Napco products.

f. CW2 spoke with Spinelli on a daily basis about the lack of sales and dropping demand for Napco products and Spinelli told CW2 that Spinelli reported the declining sales numbers to Soloway and Buchel.

g. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions. Black also told CW3 and other salespeople their sales numbers were declining.

h. A lot of salespeople CW3 spoke with in the fire and security alarm segment said their sales numbers were likewise down.

i. CW4 was hired in Fiscal Q2 2025 to help with the poor sales performance of Prima (a product within the fire and security alarm division that was introduced in October 2023) and noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

j. CW4 heard that the accessories for Prima were not available for purchase at the time of launch, which likely contributed to Prima's lack of sales.

k. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

l. CW4 confirmed that Prima was an "emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue[,]" and even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

m. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

n. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

## C. May 6, 2024 Earnings Call

157. On May 6, 2024, Defendants issued a press release reporting Napco's Fiscal Q3 2024 financial results (the "Q3 2024 Press Release") for the period ended March 31, 2024, and held an earnings call later that afternoon (the "Q3 2024 Earnings Call"). During the Q3 2024 Earnings Call, when asked about how Napco would improve its margins, Defendant Buchel falsely assured that equipment sales from locking products would continue to improve, thereby increasing margins:

> **Matt J. Summerville**, *D.A. Davidson & Co., Research Division*
> Maybe first, if we can talk about hardware gross margins. Nice improvement year-on-year, no doubt about it. But they've been kind of flattish for the last 3 quarters. Can you maybe talk about what the catalysts are as we look ahead outside of just overhead absorption to get that margin kind of marching more prominently towards your longer-term projection there?
>
> **Kevin S. Buchel**, *COO, President, Treasurer, CFO & Director*
> Okay, Matt. Well, the overhead absorption is a big factor. I don't want to diminish

> it because in the past, it has led to our margins going from low to mid-30s to high 30s, low 40s. So it's significant when we put good numbers, strong hardware numbers on the board. But absent of that, the locking products, which now 66% of the hardware sales, that brings better margins than the -- some of the intrusion products, like the radio products, now granted the radio products lead to the recurring revenue, which is the best of them all, but on a pure hardware basis, the locking does better. **And so we expect the locking products to continue to get stronger**. Dick mentioned in his remarks, some of the reasons why locking strong school security is airport infrastructure upgrades projects that are going on in buildings and hotel renovations, and there's a lot of things going on that are contributing to locking. We have 2 locking companies they're both operating really well, hitting on all cylinders, both of them at the same time.
>
> **And so locking, which has been good, we expect it to get even stronger and that should help margins even further**.

158. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that locking sales were strong, increasing, and would continue to increase, when in reality CWs confirmed locking sales were already declining and continued to decline throughout the Class Period, as evidenced by:

a. CW3 worked in the Access Pro division (which primarily sold locking products) before the Class Period until July 2024 and reported struggling with the locking product CW3 sold because it was "very old and antiquated," the software wasn't updated, and "[i]t just didn't look up-to-date for what customers wanted."

b. CW3 said that throughout the Class Period, the demand for installing a new locking system from the Access Pro division was weak because the product was "outdated" and "ugly." According to CW3, when Napco did upgrade its MVP product, it was merely a "wrapper" for the already existing software and only appeared to have updated software, but once a user "clicked on any button, it went back to looking like the old stuff."

c. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions. Black also told CW3 and other salespeople their sales numbers were declining.

d. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such

that product integrators refused to use Napco products because they were "too out of date" and distributors were destocking Napco products.

e. As a result of the Napco's outdated products, CWs 2-7 all reported Napco's sales for all its products and, thus, margins, were steadily declining throughout the Class Period.

159. During the Q3 2024 Earnings Call, Defendant Soloway touted Napco's Prima all-in-one system claiming it had "**generated strong sales and profitability**" and Defendants "**believe we can continue this growth well into the future**" and meet the 2026 goals. When asked by analysts about the uptake for Prima, Defendant Buchel responded that there has been more adoption, a lot of interest, and Napco has been picking up more share of the market:

> **Matt J. Summerville**, *D.A. Davidson & Co., Research Division*
> And then similarly, if you can talk about maybe some initial feedback you've had now that Prima's been in the market for the last couple of quarters, how you're feeling about uptake there and when maybe we start to see some of the -- some of the other businesses outside of fire really starting to drive that recurring revenue.
>
> **Kevin S. Buchel**, *COO, President, Treasurer, CFO & Director*
> **When it comes to the Prima product, more and more adoption is going on and it's starting to contribute**. It is a unique product. It's a different type of product for us because our typical alarm products are for more customization of residential and commercial. This product is for mass. It's a product that goes in very quickly. a salesman that sells the alarm job, both commercially, small commercially or residentially can actually install it themselves. He doesn't need a crew, so **he can sell the alarm system to the end user customer and put it in right away and start getting recurring revenue from it, and we get our recurring revenue from that installation. So it's the conversion process where there are thousands and thousands of companies that are using this type of mass alarm system, and we're picking up more share and we saw a lot of interest**. You were at the show, you saw it was right up front. You saw that there are many times during the day. I couldn't even see the carpet. There were so many people standing on it looking at this alarm system that spinout now for a little while. But it takes time for dealers to get used to it, to talk amongst them selves. -- and start converting over to it. And it looks very, very good that this is the ongoing process.

160. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Prima was a successful product immediately generating

recurring revenue and significant interest and sales from dealers when, in reality distributors were not selling Prima, as evidenced by:

a. CW4, who was hired in Fiscal Q2 2025 to help with the Prima's poor sales performance, noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

b. CW4 heard that the accessories for Prima were not available for purchase at the time of launch, which likely contributed to Prima's lack of sales.

c. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

d. CW4 confirmed that Prima was an "emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue[,]" and even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

e. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts prior to and throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

f. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

161. When analysts asked about the sell-through metrics with the distributors, Defendant Buchel responded that demand was "huge" and the sell-through metrics continued to show increases:

> **Jaeson Allen Min Schmidt** *Lake Street Capital Markets, LLC, Research Division*
> Kevin, just curious if you could share with us some of the sell-through metrics at the distributors?
>
> **Kevin S. Buchel** *COO, President, Treasurer, CFO & Director*
>
> **We expect to sell even more. Demand is huge. We have all these big accounts now that have become customers -- that's part of why we think we're going to move a lot of the radio inventory. And that's going to lead to the continuation of the recurring grew by 29%, which was nice. It's been growing by 25%.** Now it grew by 29%. And a lot of it is fire and fire has the great margins, and that's why it was up to 92%. On sell-through stats, we don't really disclose a lot of that. **But I can share with you that on a sequential basis, the intrusion sell-through stats showed an increase of 13%, and that's very important. So that's the division that sells among other things, the radios. And having a sequential increase of 13% seems to me that, that will bode well for that division as we head into our best quarter, historically, our fourth quarter**.

162. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that sales and demand were increasing when, in reality, sales were decreasing in all segments and Napco's sell through and other sales data showed the Company was experiencing declining sales due to outdated and obsolete technology throughout the Class Period, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products, including Napco's burglary panels (part of the fire and security alarm segment), were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they are "too out of date" and distributors were destocking Napco's products.

b. CW3 reported struggling with the locking product CW3 sold because it was "very old and antiquated," the software wasn't updated, and "[i]t just didn't look up-to-date for what customers wanted." CW3 said that throughout the Class Period, the demand for installing a new locking system from the Access Pro division was weak because the

product was "outdated" and "ugly." According to CW3, when Napco did upgrade its MVP product, it was merely a "wrapper" for the already existing software and only appeared to have updated software, but once a user "clicked on any button, it went back to looking like the old stuff."

c. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions. Black also told CW3 and other salespeople their sales numbers were declining.

d. A lot of salespeople CW3 spoke with in fire and security said their sales numbers were down.

e. CW7 said Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts prior to and throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

## D. May 6, 2024 10-Q

163. On May 6, 2024, Defendants filed Napco's Fiscal Q3 2024 financial results on Form 10-Q with the SEC for the period ended March 31, 2024, signed by Defendants Soloway and Buchel (the "Q3 2024 10-Q"). The Q3 2024 10-Q incorporated by reference the risk factors as set forth in the 2023 10-K, as well as the Form 424(b)(7) Prospectus, filed on March 7, 2024. The 2023 10-K contained false and misleading risk disclosures purporting to warn that Napco's distributors ***may*** reduce their effort to sell the Company's products, which ***may*** adversely affect the Company's financial performance:

> ***We rely on distributors to sell our products and an adverse change in our relationship with such distributors may adversely affect our financial performance***.
>
> We distribute our products primarily through independent distributors and wholesalers of security alarm and security hardware equipment. **Our distributors and wholesalers also sell our competitors' products, and if they favor our**

> **<u>competitors' products for any reason, they may fail or reduce their effort to market and sell our products as effectively or to devote resources necessary to provide effective sales, which would adversely affect our financial performance</u>**. In addition, our distributors order our products and maintain their inventory based on forecasts of potential demands from dealers and end customers, and our distributors may not be able to forecast such demand accurately, which may adversely affect our ability to generate sales and revenue in a timely manner. In some cases, distributors may delay ordering our products until they receive confirmation of orders from dealers and end customers, and this delay may cause disruption and make it more difficult for us to fill their order timely and effectively, which may adversely affect our revenue and sales.

164. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because at the time Napco was ***already*** experiencing issues with distributors who were ***already*** destocking and reducing sales and returning large amounts of products due to Napco's outdated and obsolete products, which was ***already*** adversely impacting financial performance. As a result, the warned of risk had already occurred, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco products.

b. CW3, who worked in the Access Pro division (which primarily sold locking products) before the Class Period until July 2024, reported struggling with the locking product CW3 sold because it was "very old and antiquated," the software wasn't updated, and "[i]t just didn't look up-to-date for what customers wanted."

c. CW3 said that throughout CW3's tenure, the demand for installing a new locking system from the Access Pro division was weak because the product was "outdated" and "ugly." According to CW3, when Napco did upgrade its MVP product, it was merely a "wrapper" for the already existing software and only appeared to have updated software, but once a user "clicked on any button, it went back to looking like the old stuff."

d. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were

declining in CW3's region, as well as Napco's other sales regions. Black also told CW3 and other salespeople their sales numbers were declining.

e. A lot of salespeople CW3 spoke with in fire and security said their sales numbers were down.

f. CW4 was hired in Fiscal Q2 2025 to help with the poor sales performance of Prima (a product within the first and security alarm division that was introduced in October 2023 and noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

g. CW4 heard that the accessories for Prima were not available for purchase at the time of launch (October 2023), which likely contributed to Prima's lack of sales.

h. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

i. CW4 confirmed that Prima was an "emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue[,]" and even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

j. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts prior to and throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

k. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

165. The Q2 2024 10-Q also incorporated by reference 2023 10-K risk factors which contained false and misleading risk disclosures purporting to warn that Napco ***may*** not be able to

introduce new products because distributors ***may*** not be willing to switch, which ***may*** adversely affect the Company's financial performance and growth:

> ***We may not [be] able to gain widespread or timely market acceptance of our new products and continue to build and enhance our brand to achieve growth.***
>
> We rely on introduction of new products and services to penetrate new markets and identify additional sources of revenues order to grow our business. However, **many of our distributors and customers may not be willing to change or switch to new products and equipment, or may require an extended period time to assess, test and evaluate functionalities and performance of our new products. Any delays in establishing widespread acceptance of our new products may adversely affect our financial performance and growth**. In order to ensure market acceptance of new products, we have incurred and expect to incur significant expenses in sales and marketing campaign, and we may not be able to justify such costs if the effort does not produce sufficient sales and customer accounts.

166. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because, at the time, Napco was ***already*** experiencing issues with distributors not wanting to stock Napco's new products and were, thus, ***already*** destocking and/or returning large amounts of products because they were outdated and customers did not want them which was ***already*** adversely impacting financial performance and growth. Moreover, Prima sales were low due to lack of functionality. As a result, the warned of risk had already materialized, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco's products.

b. CW3, who worked in the Access Pro division (which primarily sold locking products) before the Class Period until July 2024, reported struggling with the locking product CW3 sold because it was "very old and antiquated," the software wasn't updated, and "[i]t just didn't look up-to-date for what customers wanted."

c. CW3 said that throughout the Class Period, the demand for installing a new locking system from the Access Pro division was weak because the product was "outdated" and

"ugly." According to CW3, when Napco did upgrade its MVP product, it was merely a "wrapper" for the already existing software and only appeared to have updated software, but once a user "clicked on any button, it went back to looking like the old stuff."

d. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions. Black also told CW3 and other salespeople their sales numbers were declining.

e. A lot of salespeople CW3 spoke with in fire and security said their sales numbers were down.

f. CW4 was hired in Fiscal Q2 2025 to help with the poor sales performance of Prima (a product within the first and security alarm division that was introduced in October 2023 and noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

g. CW4 heard that the accessories for Prima were not available for purchase at the time of launch (October 2023), which likely contributed to Prima's lack of sales.

h. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

i. CW4 confirmed that Prima was an "emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue[,]" and even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

j. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

k. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have

a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

**E. August 26, 2024 Earnings Call**

167. On August 26, 2024, Defendants issued a press release reporting Napco's Fiscal Q4 and FY 2024 financial results (the "Q4 2024 Press Release") for the period ended June 30, 2024, and held an earning call later that afternoon (the "Q4 2024 Earnings Call"). When asked during the Q4 2024 Earnings Call about locking hardware sales, Defendant Buchel falsely claimed locking sales were "strong" due to differentiated features and, thus Napco had gained market share:

> **The Locking sales have been strong for several quarters in a row now**. We have 2 Locking companies. **They're both doing well. We've picked up market share**, we believe, during the times of supply chain as our competitors couldn't deliver…
>
> **Our products are also different**. We make electrified locks, not just plain old hardware locks, **puts us in a different category. And so having these 2 companies, both performing well at the same time, has created this rise**, which was up 18% for the year versus a year ago, and it's 65% of our total hardware sales, equipment sales. Can we keep this pace up? I don't know, but I think **double digits is certainly a possibility to continue. We don't see any slowing down**….

168. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that locking hardware sales were increasing, when in reality, Napco was experiencing declining sales, including in locking products, due to outdated and obsolete technology, as evidenced by:

a. CW3 worked in the Access Pro division (which primarily sold locking products) before the Class Period until July 2024 and reported struggling with the locking product CW3 sold because it was "very old and antiquated," the software wasn't updated, and "[i]t just didn't look up-to-date for what customers wanted."

b. CW3 said that throughout CW3's tenure, the demand for installing a new locking system from the Access Pro division was weak because the product was "outdated" and "ugly." According to CW3, when Napco did upgrade its MVP product, it was merely a "wrapper" for the already existing software and only appeared to have updated

software, but once a user "clicked on any button, it went back to looking like the old stuff."

c. According to CW3, overall sales in the Access Pro division were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions. Black also told CW3 and other salespeople their sales numbers were declining.

d. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they are "too out of date" and distributors were destocking Napco products.

e. CW6, who worked in the inside sales division and received orders placed by customers, such as distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

169. When asked by analyst James Ricchiuti about what Defendants were seeing in terms of "sell-through metrics[,]" Defendant Buchel claimed "**sell-through stats are good**" and "**sell-through [is] great**[.]"

170. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that sell-through stats showed increasing sales, when in reality, the opposite was true, Napco was experiencing declining sales as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco's products.

b. CW6, who worked as an inside sales specialist and received orders placed by distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the

day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

c. According to CW3, overall sales in the Access Pro division (which primarily sold locking products) were decreasing when Aaron Black took over the division in April 2023 and continued to decline throughout CW3's tenure. CW3 received sales reports which showed that sales numbers were declining in CW3's region, as well as Napco's other sales regions. Black also told CW3 and other salespeople their sales numbers were declining.

d. A lot of salespeople CW3 spoke with in fire and security said their sales numbers were down.

e. CW7 confirmed Prima sales were "struggling" and below internal targets, as discussed at internal Company sales meetings.

171. In response to an analyst question about radio business being down this quarter, and if it would continue to next quarter, Defendant Buchel touted purported "**new features**" that would drive the radio business to get "**better and better**":

> **Kevin S. Buchel** *COO, President, Treasurer, CFO & Director*
> The Radio business despite the stats that tell you it was down, and it was down, as we've said, 5% sequentially, 10% compared to last year's Q4. It's down in the -- on the radios that produce the lowest recurring. And **we are fighting like crazy to get it back, coming out with new features on our radios, which has been well received.** But the interesting thing, which I don't know if everybody picks up on, is that the recurring revenue continues to grow because the fire radios continues to do well. And as we've talked over and over about, fire radios, bring in more money than the other radios.
>
> So I was very impressed and happy that despite those stats that we talked about, that recurring was up 27% and up 26% for the year. **Fire is doing really well. Doing well with our new distributor. It's doing well with our big accounts that we've added that we've talked about, some of the big names. That, we believe, is going to just keep getting better, and we'll get the lower end radios to do better as well. And then we'll have both sides contributing and then you'll see the growth of the overall growth on the hardware side of the radios**. And we're working hard also to get through all the distribution issues. We've talked about that before. Some of our distributors had too much. We have one distributor left that has a little too much working hard to reduce that, that will help as well.

172. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading

because they gave the false impression that Defendants were innovating and adding new features to Napco's radios and that products within the fire and security alarm division were in demand, when, in reality, sales were declining because Napco products were outdated and obsolete, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products, including Napco's burglary panels (part of the fire and security alarm segment), were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco's products.

b. CW4 was hired in Fiscal Q2 2025 to help with the poor sales of performance of Prima (a product within the fire and security alarm segment that was introduced in October 2023) and noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

c. CW4 heard that the accessories for Prima were not available for purchase at the time of launch (October 2023), which likely contributed to Prima's lack of sales.

d. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

e. CW4 confirmed that Prima was an "emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue[,]" and even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

f. CW6, who worked as an inside sales specialist and received orders placed by distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

g. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor

products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

h. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

**F. <u>August 29, 2024 10-K</u>**

173. On August 29, 2024, Defendants filed Napco's FY 2024 Annual Report on Form 10-K with the SEC for the period ended June 30, 2024, signed by Defendants Soloway and Buchel (again, the "2024 10-K"). The 2024 Form 10-K contained false and misleading risk disclosures purporting to warn that Napco's distributors ***may*** reduce their effort to sell the Company's products, which ***may*** adversely affect the Company's financial performance:

> ***We rely on distributors to sell our products and an adverse change in our relationship with such distributors may adversely affect our financial performance***.
>
> We distribute our products primarily through independent distributors and wholesalers of security alarm and security hardware equipment. **<u>Our distributors and wholesalers also sell our competitors' products, and if they favor our competitors' products for any reason, they may fail or reduce their effort to market and sell our products as effectively or to devote resources necessary to provide effective sales, which would adversely affect our financial performance</u>**. In addition, our distributors order our products and maintain their inventory based on forecasts of potential demands from dealers and end customers, and our distributors may not be able to forecast such demand accurately, which may adversely affect our ability to generate sales and revenue in a timely manner. In some cases, distributors may delay ordering our products until they receive confirmation of orders from dealers and end customers, and this delay may cause disruption and make it more difficult for us to fill their order timely and effectively, which may adversely affect our revenue and sales.

174. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading

because at the time Napco was ***already*** experiencing issues with distributors who were ***already*** destocking and reducing sales and returning large amounts of products due to Napco's outdated and obsolete products which was ***already*** adversely impacting financial performance. As a result, the warned of risk had already occurred, as evidenced by:

a. According to CW1 said that prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco products.

b. CW4 was hired in Fiscal Q2 2025 to help with the poor sales performance of Prima (a product within the first and security alarm division that was introduced in October 2023) and noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

c. CW4 heard that the accessories for Prima were not available for purchase at the time of launch, which likely contributed to Prima's lack of sales.

d. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

e. CW4 confirmed that Prima was an "emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue[,]" and even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

f. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

g. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have

a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

h. CW6, who worked as an inside sales specialist and received orders placed by distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

175. The 2024 10-K also contained false and misleading risk disclosures purporting to warn that Napco ***may*** not be able to introduce new products because distributors ***may*** not be willing to switch, which ***may*** adversely affect the Company's financial performance and growth:

> ***We may not be able to gain widespread or timely market acceptance of our new products and continue to build and enhance our brand to achieve growth***.
>
> We rely on introduction of new products and services to penetrate new markets and identify additional sources of revenues order to grow our business. However, **many of our distributors and customers may not be willing to change or switch to new products and equipment, or may require an extended period time to assess, test and evaluate functionalities and performance of our new products. Any delays in establishing widespread acceptance of our new products may adversely affect our financial performance and growth**. In order to ensure market acceptance of new products, we have incurred and expect to incur significant expenses in sales and marketing campaign, and we may not be able to justify such costs if the effort does not produce sufficient sales and customer accounts.

176. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because, at the time, Napco was ***already*** experiencing issues with distributors not wanting to stock Napco's new products and were, thus, ***already*** destocking and/or returning large amounts of products because they were outdated and customers did not want them, which was ***already*** adversely impacting financial performance and growth. Moreover, Prima sales were low due to lack of functionality. As a result, the warned of risk had already materialized, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, and the tech was "not intuitive" like most of the competition, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco's products.

b. CW4 was hired in Fiscal Q2 2025 to help with the poor sales performance of Prima (a product within the first and security alarm division that was introduced in October 2023) and noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

c. CW4 heard that the accessories for Prima were not available for purchase at the time of launch, which likely contributed to Prima's lack of sales.

d. CW1 corroborated that some Prima accessories were not available upon release of the product because Napco was still testing them, including the translator, the indoor/outdoor camera, and the "takeover module."

e. CW4 confirmed that Prima was an "emerging shining star within the company to bring in hardware revenue, but especially to bring in the recurring revenue[,]" and even though Prima was launched about a year prior to CW4 joining Napco, Spinelli told CW4 Napco's sales were not where the Company wanted them to be, and they have not had success with the product in the year since it had been released.

f. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

g. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024[,]" Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so, when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

h. CW6, who worked in the inside sales division and received orders placed by customers, such as distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time

throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

177. In the 2024 10-K, Defendants also falsely asserted that "**[t]he increase in our net sales from fiscal 2023 to 2024 was driven primarily from the continued growth of our recurring services revenues**" and "**[t]he increase in net income during fiscal 2024 was due primarily to the growth of the recurring service revenues which generated a gross margin of 90% during the period**."

178. Defendants further emphasized in the 2024 10-K that they had "built a strong competitive position…" which has "**enabled us to create recurring revenue opportunities across product lines, and our goal is to expand such opportunities to generate recurring revenue that will account for over 50% of our total revenue…**"

179. The above statements were materially false and misleading when made and omitted material facts necessary to make them not misleading because they gave the false impression that recurring revenue was strong, predictable, and would continue to grow when, in fact, the recurring revenue growth reported reflected equipment sales from 12 to 18 months ago and demand for Napco products and equipment sales had been steadily declining throughout the Class Period, and were presently declining, which was certain to cause recurring revenue and recurring revenue growth to decline, as evidenced by:

a. Defendants knew but failed to adequately disclose their recurring revenue stream was dependent on the prior sale of specific hardware—namely, its radios—and there was six to eighteen months "lag" between when Napco booked revenue for a hardware sale and when it could begin recognizing the associated high-margin recurring service revenue from that same unit. As a result of the six-to-eighteen-month lag, the "recurring service revenue" growth reported was not a reflection of ***current***-quarter demand or sales performance, rather it was a "look-back" metric, reflecting the results of a pipeline of radio sales that had occurred two-to-six quarters prior.

b. The Fuzzy Panda report corroborated that Napco was likely to miss its long-term 2026 guidance for recurring revenue because the recurring revenue from which Napco was

benefiting during FY2025, is likely the result of radio sales occurring years prior. Thus, the recurring revenue will not last.

c. CW4 was hired in Fiscal Q2 2025 to help with the poor sales performance of Prima (a product within the first and security alarm division that was introduced in October 2023) and noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

d. CW6, who worked in the inside sales division and received orders placed by customers, such as distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

e. CW7 said that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

180. The 2024 10-K also contained a false and misleading risk disclosure purporting to warn that Napco "**<u>may not be able to grow our recurring service revenue business to generate consistent revenue and profitability</u>**" which ***may*** ultimately reduce profitability. This risk disclosure was materially false and misleading when made or omitted to state material facts necessary to make the statement not misleading because at the time Napco was ***already*** experiencing issues with growing its recurring service revenue, which was ***already*** affecting revenue and profitability, and as a result, the warned of risk had already occurred, as evidenced by:

a. Defendants knew but failed to adequately disclose their recurring revenue stream was dependent on the prior sale of specific hardware—namely, its radios—and there was six to eighteen months "lag" between when Napco booked revenue for a hardware sale and when it could begin recognizing the associated high-margin recurring service revenue from that same unit. As a result of the six-to-eighteen-month lag, the "recurring

service revenue" growth reported was not a reflection of ***current***-quarter demand or sales performance, rather it was a "look-back" metric, reflecting the results of a pipeline of radio sales that had occurred two-to-six quarters prior.

b. The Fuzzy Panda report corroborated that Napco was likely to miss its long-term 2026 guidance for recurring revenue because the recurring revenue from which Napco was benefiting during FY2025, is likely the result of radio sales occurring years prior. Thus, the recurring revenue will not last.

f. CW4 was hired in Fiscal Q2 2025 to help with the poor sales performance of Prima (a product within the first and security alarm division that was introduced in October 2023) and noticed within two months of being hired, that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

g. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

c. CW6, who worked in the inside sales division and received orders placed by customers, such as distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300

## G. November 4, 2024 Press Release and Earnings Call

181. On November 4, 2024, Defendants issued a press release reporting Napco's Fiscal Q1 2025 financial results (the "Q1 2025 Press Release") for the period ended September 30, 2024, and held an earning call that day (again the "Q1 2025 Earnings Call"). The results revealed a significant slowdown in equipment sales, which decreased 6% year-over-year, and a decrease in locking sales of 8%.

182. In the Q1 Earnings Call, Defendant Buchel attributed the sales decline to minor distributor inventory adjustments and characterized them as temporary: "[**T]he decline [in locking**

**sales] was primarily attributable to several locking distributors efforts to lower their inventory levels**."

183. Later that morning, Defendants hosted the Q1 2025 Earnings Call. During the Q1 2025 Earnings Call, Defendants deliberately misled investors by materially minimizing the severity and duration of the distributor destocking. Defendant Buchel stated:

> Equipment sales for the quarter decreased 6%... The decrease in locking sales was primarily attributable to several locking distributors' efforts to **temporarily lower their inventory levels. And this, we believe, is temporary**…

184. Later during the Q1 2025 Earnings Call, an analyst pressed Defendants to "help us understand" why they think the distributors lowering their hardware inventory was "temporary." Defendant Buchel responded that the sell-through data was still high, and that the distributors assured him it was one quarter event and sales would come back in the next quarters:

> **Matt J. Summerville**, *D.A. Davidson & Co., Research Division*
> Kevin, in your prepared remarks, you mentioned several distributors temporarily lowering locking hardware inventory and that this situation is different than the multi-quarter trend you saw on the radio side. Help us understand why this is different and whether or not you think you can grow equipment revenues for the full year? And then I have a follow-up.
>
> **Kevin S. Buchel** *COO, President, Treasurer, CFO & Director*
> So, with radios, we were coming off of the 3G sunset where all the distributors were loading up because they couldn't get radio deliveries from anybody except us, and they had to be prepared for the sunset. So, we saw all of our distributors having a lot of inventory. And then when the sunset came and went, they had too much.
>
> And we knew it was going to take several quarters for it to work its way through. And that's what happened. It took several quarters. And now we could say we're finished with that based on the very strong radio sales we saw in this quarter.
>
> **With locking, it's much different. We can see from their inventory levels, we can see from the sell-through. This is a much different situation. They wanted to slow up in this quarter**. Why? It's hard to say. Is it the election? I heard that from a few of the distributors. They want to wait until the election, then we'll start buying again. I heard that from some, it was budget related. They want to wait until the new budget period because a lot of the projects start with an October 1 budget period.

> **I talked to several of them personally, and they assured me that it was a one quarter type event. That's what I'm going by. Locking is strong**. It comes from a lot of different avenues, schools, there's a lot of school activity. We're hopeful to announce a school win later this week. Stay tuned.
>
> There's a bunch of hospital. Upgrade projects we're working on. So, we feel good about it. **Don't take what happened in one quarter as being the new norm. That's how we feel. So, we think we'll grow as the year progresses. This is just one quarter.**
>
> Even with this, even with the disappointment of the locking, we still earned over $11 million, still 25% net income as a percentage of sales. **It will come back over the next coming quarters**. That's what we believe.

185. Another analyst further pressed Defendants on the distributor issue, challenging Defendants on it being a one quarter issue. Defendant Buchel explained why it was going to be a one-quarter event, that sales will be back up next quarter, and the full year will be good for locking:

> **James Andrew Ricchiuti**, *Needham & Company, LLC, Research Division*
> So Kevin, I do want to go back to the locking business. Where are we, though? ***What gives you the assurance that the distributors, it's going to be a 1 quarter phenomenon, just basically what they're telling you?*** I know it's different, but ***obviously, we've heard of inventory corrections before and it takes a little bit more than a quarter. I mean, how confident are you? Have you spoken to enough of the distributors?*** And by the way, are these the same distributors that are carrying your radios? Or are these different players?
>
> **Kevin S. Buchel**, *COO, President, Treasurer, CFO & Director*
> In some cases, it's the same. In some cases, it's not. And I spoke to our largest distributor of locking products, the largest one. That's not the same. They don't distribute radios. They're locking guys. Spoke to the President, we spoke at length. **He assured me this is just a temporary 1-quarter event**. I said to him, what is this? The election, what does the election have to do? He said, look, **I just want to say it's 1 quarter, and we'll be back next quarter**.
>
> **So, I'm banking on it based on conversations from him. Other things I'm banking on is, I see the stats. I see the sell-through stats. I see their inventory level. There's no reason why it shouldn't come back**. The only differential you have is, there are special projects within locking. We had a big project that went on last year, the Waldorf Astoria project that happened throughout fiscal 2024.
>
> It's somewhat still in 2025. So, that makes for a difficult comp. But there are other projects that are going on this year. There'll be a school security announcement, and there are some other things. So, **as we get those special projects this year and**

> **the distributors go back to what they were doing, that's how you get the confidence that locking will be very good this year**.

186. Later in the call, Defendant Soloway doubled down on locking, claiming, "[**t]he locking hardware business has been doing fabulously each quarter in the past. So, 1 quarter speed bump by a couple of distributors cannot be looked at as indicative of the future**."

187. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that the decrease in locking sales was just temporary, when in reality locking sales had already been declining throughout the Class Period, which the sell-through data demonstrated, and Defendants knew it would continue to decline going forward because demand for Napco's products was low, given that they were outdated, as evidenced by:

a. According to CW1, both prior to and throughout the Class Period, Napco products were old and outdated, the tech was "not intuitive" like most of the competition, and Napco's lack of technological innovation caused its products to become obsolete, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco products.

b. CW5 joined the Access Pro division in September 2024 and found customer demand for Napco products to be lower than CW5 expected due to Napco's lack of innovation and failure to keep up with the competition technologically, including by failing to timely offer cloud-based and integrated products.

c. CW6, who worked in the inside sales division and received orders placed by customers, such as distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

188. Additionally on the Q1 2025 Earnings Call, in response to an analyst question of whether "there a potential for the service revenues to exceed equipment revs on a go-forward basis," Defendant Soloway misleadingly stated without any reasonable basis that Napco expected to get increased market share for both:

> **Jeremy Scott Hamblin,** *Craig-Hallum Capital Group LLC, Research Division*
> Last one for me. Just as we look a little bit further ahead and kind of what you're driving towards for FY '26. And previously, you talked about your mix of business hoping to achieve 50-50 equipment revs to service revs in that fiscal year, you're getting close to that 50% already. And it sounds like quite a bit of momentum in the radio portion of your business.
>
> Is there a potential for the service revenues to exceed equipment revs on a go-forward basis and take an even higher portion, particularly if the locking part of your business I know that, that sounds like it's a 1-quarter issue, but just in terms of visibility that you have on what that revenue mix might look like next fiscal year?
>
> **Richard L. Soloway,** *Founder, Chairman, CEO & Secretary*
> Well, I would say we're pushing the pedal to the metal, both on the recurring revenue radio business and also on the hardware, the locking hardware business...
>
> But **we expect both the recurring revenue business with new products and the locking business with new products and getting more market share in both of those categories will drive us to higher heights than we've been talking about**….

189. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because it gave the false impression that both recurring revenue and the locking business would improve when sales were actually declining, new products were not innovative and were flopping, and recurring revenue would soon drop off, as evidenced by:

a. According to CW1, who provided technical and software assistance to customers who purchased Napco equipment, when Napco finally released the MVP locking product (one of the new products that Defendants Soloway described as a "new growth opportunity") in November 2024, competitors had already been using the cloud in their products for several years.

b. CW5 corroborated that "Napco missed the boat on cloud-based," as customers were expecting cloud-based products, but Napco failed to deliver and by the time Napco released MVP, there were already "several major players" in cloud-based products.

c. CW3 described MVP as merely a "wrapper" for the already existing software, and once a user "clicked on any button, it went back to looking like the old stuff."

d. CW1 said that both prior to and throughout the Class Period, Napco products were old and outdated, the tech was "not intuitive" like most of the competition, and Napco's lack of technological innovation caused its products to become obsolete, such that product integrators (who design and install locking and fire and security alarm systems) refused to use Napco products because they were "too out of date" and distributors were destocking Napco products.

e. CW5 joined the Access Pro division (which primarily sold locking products) in September 2024 and found customer demand for Napco products to be lower than CW5 expected due to Napco's lack of innovation and failure to keep up with the competition technologically, including, by failing to timely offer cloud-based and integrated products.

f. CW6, who worked in the inside sales division and received orders placed by customers, such as distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

g. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts prior to and throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

h. Defendants knew but failed to adequately disclose their recurring revenue stream was dependent on the prior sale of specific hardware—namely, its radios—and there was six to eighteen months "lag" between when Napco booked revenue for a hardware sale and when it could begin recognizing the associated high-margin recurring service revenue from that same unit. As a result of the six-to-eighteen-month lag, the "recurring service revenue" growth reported was not a reflection of ***current***-quarter demand or sales performance, rather it was a "look-back" metric, reflecting the results of a pipeline of radio sales that had occurred two-to-six quarters prior.

i. The Fuzzy Panda report corroborated that Napco was likely to miss its long-term 2026 guidance for recurring revenue because the recurring revenue from which Napco was benefiting during FY2025, is likely the result of radio sales occurring years prior. Thus, the recurring revenue will not last.

## H. <u>November 4, 2024 10-Q</u>

190. On November 4, 2024, Defendants filed Napco's Fiscal Q1 2025 financial results on Form 10-Q with the SEC for the period ended September 30, 2024, signed by Defendants

Soloway and Buchel (the "Q1 2025 10-Q"). The Q1 2025 10-Q incorporated by reference the risk factors as set forth in the 2024 10-K as well as the Form 424(b)(7) Prospectus, filed on March 7, 2024, which contained false and misleading risk disclosures purporting to warn that Napco ***may*** not be able to introduce new products because distributors ***may*** not be willing to switch, which ***may*** adversely affect the Company's financial performance and growth:

> ***We may not be able to gain widespread or timely market acceptance of our new products and continue to build and enhance our brand to achieve growth***.
>
> We rely on introduction of new products and services to penetrate new markets and identify additional sources of revenues order to grow our business. However, **many of our distributors and customers may not be willing to change or switch to new products and equipment, or may require an extended period time to assess, test and evaluate functionalities and performance of our new products. Any delays in establishing widespread acceptance of our new products may adversely affect our financial performance and growth**. In order to ensure market acceptance of new products, we have incurred and expect to incur significant expenses in sales and marketing campaign, and we may not be able to justify such costs if the effort does not produce sufficient sales and customer accounts.

191. The statements in the preceding paragraph were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because, at the time, Napco was ***already*** experiencing issues with distributors not wanting to stock Napco's new products and were, thus, ***already*** destocking and/or returning large amounts of products because they were outdated and customers did not want them, which was ***already*** adversely impacting financial performance and growth. Notwithstanding Defendants' efforts to downplay the risk by describing distributors' destocking as a temporary, one-quarter issue, this risk was virtually certain to materialize again because Napco's products had not improved technologically, its new products were behind the competition, and customer demand continued to decline, as evidenced by:

a. According to CW1, who provided technical and software assistance to customers who purchased Napco equipment, when Napco finally released the MVP locking product

(one of the new products that Defendants Soloway described as a "new growth opportunity") in November 2024, competitors had already been using the cloud in their products for several years.

b. CW5 corroborated that "Napco missed the boat on cloud-based," as customers were expecting cloud-based products, but Napco failed to deliver and by the time Napco released MVP, there were already "several major players" in cloud-based products.

c. CW5 was in the Access Pro division (which primarily sold locking products) between September 2024 and November 2024 and found customer demand for Napco products to be lower than CW5 expected due to a lack of innovation and failure to keep up with the competition technologically, including by failing to timely offer cloud-based and integrated products.

d. CW4 was hired in Fiscal Q2 2025 to help with the Prima's poor sales performance, and noticed within two months of being hired that the problem with Prima was it used SecureNet instead of the more popular Alarm.com for its backend technology to process alarm signals. Customers and dealers lost interest in Prima "almost all the time" when they learned it did not use Alarm.com which was a "huge, very, very big" obstacle to the sales of Prima. When CW4 provided feedback to Jim Pless and Spinelli, they already knew, stating "Yep, we are getting the same thing."

e. CW7 corroborated CW1 and CW4 that Prima sales were struggling and below internal forecasts throughout CW7's tenure due to lack of functionality that other competitor products had, including lack of a secondary keypad or installer app and the inability to interface with multiple systems. CW7 learned from CW7's bosses that Prima sales had been below internal forecasts since the product was launched in October 2023.

f. During the Q1 2025 Earnings Call on November 4, 2024, Defendant Buchel admitted that unbeknownst to investors, when "Prima was introduced in [Fiscal] Q1 of 2024," Napco "didn't have the peripherals, the accessories[]" which "stalled the growth as the year progressed. And so when we came to Q1 of 2025, we were ***just starting*** to have a full line of accessories" and "[t]he misstep, if you will, was that you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

g. CW6, who worked in the inside sales division and received orders placed by customers, such as distributors, noticed towards the second half of CW6's tenure (approximately August 2024 through April 2025) that the volume of orders steadily declined. "Starting around fall of 2024, the orders were going down and there was more down time throughout the day." Due to the decline in sales, CW6's monthly commission check shrank from about $700-$900 to $400-$600, and sometimes as low as $300.

## VI. THE TRUTH EMERGES

### A. September 5, 2024 Partially Corrective Disclosure

192. The truth about Napco's recurring revenue, and its consistency and predictability, was partially revealed in a short-seller report issued on September 5, 2024 by Fuzzy Panda Research. In the report, Fuzzy Panda reported on conversations with former employees, competitors, and industry experts, and concluded that Napco's premium valuation and 26 quarters of revenue growth (excluding some during Covid) were "too good to be true".

193. In its report, Fuzzy Panda revealed that Napco was likely to miss its long-term 2026 guidance for recurring revenue because of the long delay in the recurring revenue from the sale of a radio unit. Napco sells to a distributor, who then sells to a dealer or installer, who then installs the product with the end user. The end user activates the radio which begins the recurring revenue service. Napco also runs specials on the radio, with a free period, which could be one to twelve months of free radio monitoring, delaying the recurring revenue even further. Thus, the recurring revenue from which Napco was benefiting during FY2025 was the result of radio sales from years prior, including during the 3G sunset period. As a result, according to the Fuzzy Panda report, the recurring revenue will not last.

194. Analysts, thus, understood the sales cycle for recurring revenue to start was between 9 and 12 months after the equipment sale. A Davidson report dated November 4, 2024, states, "we believe the sales cycle (sell in to the distributor, sell out to the dealer, and then subsequentially installed/turned on) for StarLink radios to [be] approximate[ly] 9-12 months."

195. Fuzzy Panda further revealed that Napco's past success was largely attributable to the 3G sunset, which was over, and at the time of the sunset, Napco had a superior fire radio product with dual sim cards at a good price and benefited over its competitors. However, since then, Napco's competitors offered a dual sim card product and promotional pricing and Napco had

yet to innovate a better product. According to the Fuzzy Panda report, "[t]he long lag between original equipment radio sales turning into recurring revenue means that the post 3G sunset should finally start showing up in their recurring revenue too."

196. Moreover, Fuzzy Panda raised concerns about Napco's entry into the residential market with its Prima product, suggesting that success there will be limited, stating, "[w]e think it's highly unlikely that Napco's Prima product portfolio is going to win out against the DIY security giants from Amazon's Ring and Google's Nest."

197. Upon the news, Napco's stock price declined from $43.39 per share on September 4, 2024, to $35.50 per share on September 5, 2024, a decline of $8.89 per share, or 20.5%, on unusually heavy trading volume.

198. On September 6, 2024, Napco issued a press release in response to the Fuzzy Panda report, claiming that "there is no news here" because the report "references an old class action lawsuit that the Company disclosed months ago." Napco further sought to "set the record straight," calling Fuzzy Panda's claim without basis:

> Fuzzy Panda's suspicion of our 90% profit margin on recurring revenue is without basis and was subject to scrutiny as part of our recently completed investigation. Our commonly referenced peer, Alarm.com, reports a gross margin of 86% on its recurring revenue. Our recurring revenue is derived mostly from commercial installations as opposed to that of Alarm.com, which is mostly derived from residential installations that typically have lower gross margins.

199. The Napco response issued on September 6, 2024 failed to address the Fuzzy Panda Report's other allegations.

### B. <u>November 4, 2024 Partially Corrective Disclosure and Materialization of the Risk</u>

200. On November 4, 2024, Napco released its Fiscal Q1 2025 financial results, revealing a 6% decline in equipment sales "primarily due to locking sales decreasing 8%" as a result of "several locking distributors' efforts to temporarily lower their inventory levels" and a

42% decline in Prima sales year-over-year. Defendant Buchel assured investors that the distributor destocking was "temporary," stating "Don't take what happened in one quarter as being the new norm…This is just one quarter…It will come back over the next coming quarters."

201. When asked by an analyst from Needham, "[w]hat gives you the assurance that the distributors, it's going to be a 1 quarter phenomenon," Defendant Buchel responded that he personally "spoke to our largest distributor of locking products" who purportedly "assured [Buchel] this is just a temporary one quarter event:"

> **James Andrew Ricchiuti** *Needham & Company, LLC, Research Division*
> So Kevin, I do want to go back to the locking business. Where are we, though? ***What gives you the assurance that the distributors, it's going to be a 1 quarter phenomenon***, just basically what they're telling you? I know it's different, but obviously, we've heard of inventory corrections before and it takes a little bit more than a quarter. I mean, ***how confident are you? Have you spoken to enough of the distributors***? And by the way, are these the same distributors that are carrying your radios? Or are these different players?
>
> **Kevin S. Buchel** *COO, President, Treasurer, CFO & Director*
> In some cases, it's the same. In some cases, it's not. And ***I spoke to our largest distributor of locking products, the largest one***. That's not the same. They don't distribute radios. They're locking guys. ***Spoke to the President, we spoke at length. He assured me this is just a temporary 1-quarter event***. I said to him, what is this? The election, what does the election have to do? ***He said, look, I just want to say it's 1 quarter, and we'll be back next quarter***. So, I'm banking on it based on conversations from him. Other things I'm banking on is, ***I see the stats. I see the sell-through stats. I see their inventory level. There's no reason why it shouldn't come back***….

202. Defendant Soloway, likewise, downplayed the impact of declining equipment sales, calling it a minor "speed bump" and claiming the locking hardware business was going to get more market share, which would generate more recurring revenue:

> **Richard L. Soloway** *Founder, Chairman, CEO & Secretary*
> Well, I would say we're pushing the pedal to the metal, both on the recurring revenue radio business and also on the hardware, the locking hardware business. The locking hardware business has been doing fabulously each quarter in the past. ***So, 1 quarter speed bump by a couple of distributors cannot be looked at as indicative of the future. But we expect both the recurring revenue business with***

> ***new products and the locking business with new products and getting more market share in both of those categories will drive us to higher heights*** than we've been talking about.

203. Defendant Soloway further assured investors that Napco's products had the best features and, thus, Napco's radios "it's the best radio out there…So it will keep contributing lots of recurring revenue[.]"

204. With regard to Prima, Defendant Buchel admitted that Prima sales quickly "stalled" after Prima was introduced in Fiscal Q1 2024 because it lacked the accessories that customers demanded and it took Napco a full year before it was "starting to have a full line of accessories:"

> Yes, pretty confident, Raj, because Prima was introduced in Q1 of 2024. That was its coming out party, so to speak. And we had a lot of sales that quarter. ***But what we didn't have, we didn't have the peripherals, the accessories. And so, that kind of stalled the growth as the year progressed***. And so, when we came to ***Q1 of 2025***, we were ***just starting to have a full line of accessories***. And so, when you compare last year, the coming out party of Prima to this year's Q1, it was different. It was down. But because the accessories now are available, we're starting to see an uptick of those sales. And so, going forward in the rest of this fiscal year, on a comparative basis, I think it will be up every quarter. But it wasn't in First quarter, and that's what drove that segment to be down versus a year ago[.]

205. Buchel characterized Prima's lack of accessories as a "misstep" because "you can't really have a product that doesn't have a full complement of accessories and expect it to be successful."

206. Upon the news of Napco's declining equipment sales and distributor destocking and Prima's failed launch, Napco's stock price declined from $38.59 per share on Friday, November 1, 2024 to $34.51 per share on Monday, November 4, 2024 on more than double the typical trading volume.

207. Napco's reported decline in equipment sales was also a materialization of the risk of declining demand for Napco's products due to Napco selling outdated products with obsolete features and technology. The declining equipment sales that Napco reported on November 4, 2024

were a foreseeable consequence of the earlier concealed facts regarding declining demand for Napco's obsolete and outdated products.

### C. February 3, 2025 Partially Corrective Disclosure and Materialization of the Risk

208. The previously undisclosed risk of the declining demand for Napco's products (contrary to Defendants' misstatements which suggested otherwise)—due to Napco's products being obsolete and outdated—further materialized on February 3, 2025, when Defendants revealed that the equipment declines were ***not temporary*** and would continue into the foreseeable future, and walked back their goals of achieving FY2026 targets of $300 million in annual revenues with 40% margins. Napco's declining equipment revenues that forced Napco to walk back their FY 2026 revenue targets were foreseeable consequences of the earlier concealed facts about declining demand for Napco's obsolete and outdated products.

209. On February 3, 2025, Defendants held an earnings call to discuss the Company's second quarter 2025 financial results (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendants shocked the market when they revealed results below expectations due to non-temporary, continuing further declines in equipment revenues as a result of reduced sales from the Company's largest distributors. In pertinent part, Defendant Buchel admitted:

> ***Equipment sales for the quarter decreased 25%*** to $21.7 million as compared to $29 million last year. The decrease in net equipment sales was ***primarily attributable to reduced sales from 2 of the company's larger distributors***, one of which our largest customer who purchases both intrusion and locking products, eliminated all quarter end purchases from all manufacturers in order to reduce their inventory levels for their December 31 year-end.
>
> ***This distributor I spoke to personally***, and he said, it's like an old Seinfeld line. He said, "it's not you, it's us." So it's a decision they made had nothing to do with our product. Our sell-through was good, the corporate decision they made. And the other one, there was another distributor who was going through a management restructuring, and that resulted in a significant reduction in their purchase. And in addition to the timing of project work related to a significant New York City

> building renovation for custom locking products resulted in reduced sales in locking in our Q2 as this project began in fiscal 2024 and it's winding down in fiscal 2025.
>
> ***Equipment sales for the 6 months decreased 16% to $44.6 million as compared to $53.4 million for the same period, and the decrease was primarily due to the aforementioned reasons***, I just mentioned. Gross profit for the 3 months ended December 31, 2024, decreased 2% to $24.4 million with a gross margin of 57% as compared to $25 million with a gross margin of 53% for the same period last year. The gross profit for the 6 months increased 4% to $49.1 million with a gross margin of 57% as compared to $47.4 million with a gross margin of 53% a year ago.
>
> …
>
> ***Gross profit for equipment revenues in Q2 decreased by 39% to $5.1 million with a gross margin of 24% as compared to $8.4 million with a gross margin of 29% last year, and gross profit for equipment revenues for the 6 months decreased 31% to $10.5 million with a gross margin of 24% as compared to $15.2 million with a gross margin of 29% for the same period last year***. The 400 basis point increase in overall gross margin is due to the continued very profitable recurring revenue. The decrease in gross profit and gross margin from equipment sales for both the 3 and the 6 months ended December 31, 2024, is primarily the result of the aforementioned lower sales levels as well as lower overhead absorption of fixed costs -- fixed overhead costs from our Dominican Republic manufacturing facility.
>
> . . .
>
> And adjusted EBITDA for the quarter decreased 19% to $12.2 million or $0.33 per share, and that compares to $15.1 million or $0.41 per diluted share for the same period last year. And that equates to an EBITDA margin of 28%, and that compares to 32% last year. And the adjusted EBITDA for the 6 months decreased 12% to $24.7 million or $0.67 per diluted share, and that compares to $28 million or $0.76 per diluted share for the same period last year, and that equates to an adjusted EBITDA margin of 28% this year compared to 31% last year. (Emphasis added).

210. During the question-and-answer portion of the call that followed, analysts asked about Napco's FY2026 Targets, to which Defendant Buchel admitted that they have "taken a step back" and acknowledged that he did not know if they would achieve those goals by the original target of end of 2026, stating in pertinent part:

> **Jeremy Scott Hamblin,** *Craig-Hallum Capital Group LLC – Research Division*
> You talked about kind of the push in 2026 towards a goal to get to a 50-50 split on your equipment versus your recurring service revenues and driving that business really to kind of $300 million in total revenues, which would imply $150 million in

> the RSR. ***It seems like that's not likely a goal that can be achieved from kind of current levels***. But I wanted to get a sense for if you could maybe reframe for us where you think you could bounce back here and how we should be looking at the business, given that this is kind of a second straight quarter in which you've had adjusted EBITDA margins in the 28% range and kind of with that target that you had laid out before, you've been talking about maybe getting adjusted EBITDA margins up towards 40% plus. And I know that's still, I'm sure, the long-term goal, but I wanted to sense for what's a bit more kind of visibility on where you are with the business today.
>
> **Kevin S. Buchel**, *COO, President, Treasurer, CFO & Director*
> Right. So our goal is to get the EBITDA margin in the mid-40s. And when we were at 32%, we were on our way to it. So ***now we've taken a step back***. ***We're 28%. Still a very strong EBITDA margin, but not our goal***. We'll hit our goal. We need a few things to happen. We need the recurring to continue to grow. I wanted to see it grow in the 20% range, as I said earlier. When we originally created the goal, the $150 million, $150 million to 45% EBITDA target, the margin that we used was 80% because that's what it was at the beginning of this recurring revenue journey. Now it's 91%. And could it go higher? Yes, it could. But at 90% and grow it by 20% a year, that's step 1. ***Step 2, we need the equipment 10% increase, not what we saw this quarter, not what we saw last quarter. We need about 10%. We don't need anything more dramatic than that, but we need 10%.*** And we don't need -- because originally, we had margins much higher on the equipment than they're running now. They need to be in the 30s. If we can get that, grow by 10%, margins in the 30s, get the recurring to grow 20%, 90% margin and keep your OpEx reasonable, grow it by maybe 10% more per year, then we'll be in the 40s. ***So I don't know if we'll get there exactly the original target was the end of '26***, call it, 1.5 years from now. But we'll be -- we'll get there. And we want to show that we're back -- well back to being on our way towards that goal. And the next couple of quarters, I think, will give that confidence.

211. Investors reacted immediately to Napco's revelation. The price of Napco's common stock declined dramatically, from a closing market price of $36.70 per share on January 31, 2025 to $26.93 per share on February 3, 2025, a decline of about 26.62%.

212. Analysts reacted with surprise and quickly downgraded Napco's stock. For example, an analyst from Craig-Hallum Capital Group LLC downgraded Napco to hold on February 4, 2025, describing "FQ2 downside was led by equip revs that were $5.5M below our model with softness across Intrusion and Access alarm products along with weakness [sic] in door locking products (that caused FQ1 miss)."

## VII. POST-CLASS PERIOD EVENTS CONFIRMING DISTRIBUTOR DESTOCKING AND DECLINING EQUIPMENT SALES WERE MORE THAN "TEMPORARY"

### A. May 5, 2025 Press Release and Earnings Call

213. On May 5, 2025, Napco released more disappointing news for Napco's Fiscal Q3 2025 financial results, reporting continue declines in equipment revenue. The same day, Defendants held an earnings call (the "Q3 2025 Earnings Call"). During the Q3 2025 Earnings Call, Defendant Buchel reported equipment revenue and net income for the quarter decreased 10.8% and 23.3%, respectively.

214. On the Q3 2025 Earnings Call, Defendant Buchel admitted that the decrease in net equipment sales was primarily due to reduced sales of approximately $5.1 million from three of Napco's largest distributors. The first distributor, who purchases both intrusion and Napco's locking products, "made a corporate-wide decision to reduce purchases to stabilize their existing inventory levels." The second distributor, a locking distributor, reduced their purchases "due to the timing of a project, and the project work with their customer was less this year than it was last year." The third distributor, a locking distributor, "made the decision to reduce their inventory levels due to the uncertainty of the economy, including pending tariffs." Defendant Soloway claimed Q3 brought "external challenges beyond our control[.]"

215. In response to an analyst's question asking about the product pipeline, Defendant Soloway went on to "describe the product line that we have" naming several products but completely omitted Prima. Later on the call, analyst James Ricchiuti of Needham & Company, LLC asked for an update on Prima. Defendant Buchel admitted that Napco thought it was going to be a "big 10,000 a month product" but it never made it to that point. Defendant Buchel further stated that "we introduced it too soon," admitting that they "didn't have all the accessories…" Defendant Buchel also blamed the residential segment, calling it too "cutthroat":

**James Andrew Ricchiuti**, *Needham & Company, LLC, Research Division*
And one quick question, if we could, an update on Prima. I haven't heard much on that. How satisfied are you with the progress you're seeing on that product?

**Kevin S. Buchel**, *COO, President & Director*
Well, ***we said we thought this could be a big 10,000 a month product. It hasn't gotten to that point***. It's much better than it was. I think you've heard us say that ***we introduced it too soon, didn't have all the accessories***… Numbers have improved. We're still working hard because we wanted to improve even more. ***It's a very cutthroat segment. Residential is much different than commercial***. As you know, Jim, we're mostly in commercial. But there's an area there, and we're working it hard. So you saw it. If you were at ISC, you saw it. We got a lot of attention. It's still a product in development, getting those numbers higher to the point where we want to be.

**B. August 25, 2025 Press Release and Earnings Call**

216. On August 25, 2025, Napco again released more disappointing financial results for Q4 2025, reporting "[e]quipment sales for the quarter decreased 5.5% to $28.3 million compared to the $29.9 million in the year prior. Equipment sales for the year ended June 2025 decreased 15.7% year over year to $95.3 million as compared to $113.1 million for the same period last year."

217. Defendants continued to attribute the decrease in equipment sales on August 25, 2025 to the "***destocking strategies of some of our larger distributors*** throughout the year[.]" Yet, by this point, it was clear that the distributors destocking was not a one-time, or temporary event, as Defendants tried to claim quarter after quarter with declining equipment sales.

## VIII. THE INDIVIDUAL DEFENDANTS ACTED WITH SCIENTER

218. Defendants acted with scienter, in that they had actual knowledge of the materially false and misleading nature of their statements and omissions, or acted with severe recklessness as to their truth or falsity.

219. Considered collectively, the allegations herein create a strong inference that Defendants acted with scienter. The combination of their admitted access to contradictory internal

data, the core nature of the matters misrepresented, the magnitude and specificity of the false assurances, and their strong motivations establishes that Defendants either knew or recklessly disregarded that their statements were materially false and misleading when made. This inference is at least as compelling as any opposing inference.

### A. Defendants' Admittedly Accessed and Reviewed Detailed Distributor and End-User Sales and Inventory Data on a Real-Time Basis

220. Throughout the Class Period, Defendants repeatedly emphasized their granular visibility into the distribution channel. Defendants touted "sell-through stats" as the "key stat" for understanding the "vibrancy of the business" that "shows what our distributors are selling of our product to dealers. It's the dealers that's the key."

221. During the Class Period, Buchel stated "[w]e watch all these stats every week, every month. We watch the inventory levels for all of our distributors" and "[w]e can see from their inventory levels, we can see from the sell-through," "I see the sell-through stats. I see their inventory level."

222. As the CWs confirmed, this data clearly showed that end-user sales had been declining throughout the Class Period, and the magnitude of the inventory glut in the channel, indicating that inventory was building up to levels that necessitated a prolonged period of destocking.

223. Despite possessing this contradictory information, Defendants publicly claimed sales were increasing due to Napco's superior product and characterized later destocking as "temporary." This deliberate contradiction between known internal data and public statements constitutes strong evidence of actual knowledge or, at a minimum, severe recklessness.

## B. Defendants Received POS Reports Showing Declining Sales, Which They Discussed at Weekly Sales Meetings Throughout the Class Period

224. Defendants' receipt of POS Reports and attendance at weekly sales meetings discussing continually declining sales throughout the Class period creates a strong inference of scienter.

225. Indeed, throughout CW2's tenure, distributors sent monthly emails to CW2, Defendants and other sales personnel attaching POS Reports pursuant to distributor contract obligations. The POS Reports broke down the sell-through numbers based on the distributor's different regions and showed the distributors were experiencing declining sales of Napco products throughout the Class Period.

226. During CW2's tenure in the fire and security division, CW2 had weekly sales meetings with Senior Vice President Stephen Spinelli to report sales numbers, broken down by distributor, which showed sales steadily declining. Spinelli and Defendant Buchel, among other executives, attended these meetings with CW2. According to CW2, Napco's declining sales were discussed at every weekly sales meeting during CW2's tenure.

227. Moreover, Defendant Buchel admitted on November 4, 2024, "I talked to several of them [distributors] personally[.]"

228. Defendants' attendance at meetings, receipt of POS reports and admitted personal discussions with Napco's largest distributors discussing and reporting on declining sales throughout CW2's tenure of as much as 25% according to CW2 and for all Napco products according to the CWs creates a strong inference of scienter.

## C. The Core Operations Doctrine Supports a Strong Inference of Scienter

229. The misrepresentations here involved equipment sales (the majority of revenue), locking products (the most profitable line), distributor relationships (the largest sales channel), and

recurring revenue (the central element of the growth strategy). Thus, the matters misrepresented by Defendants involved the core aspects of the Company's operations and financial performance. Misrepresentations involving "core operations" support a strong inference of scienter.

230. Moreover, Defendants Soloway (CEO) and Buchel (CFO and EVP of Operations) were the top executives responsible for overseeing these core aspects of the business. It is implausible that they were unaware of the true facts regarding the significant and prolonged destocking crisis that was severely impacting equipment sales and threatening the FY2026 Targets.

### D. <u>Defendants' Suspicious Stock Sales Support an Inference of Fraud</u>

231. Given the significant lag between when equipment sales are booked and when Napco begins recognizing the associated recurring service revenues (*i.e.*, up to 18 months), as detailed in Section IV.G. *supra,* Defendants were able to sell their shares over the course of calendar year 2023 and 2024 when recurring service revenues appeared relatively stable, before the undisclosed declining demand for Napco's outdated radios manifested, after the lag period, in declining service revenues. Defendants were motivated to engage in the alleged fraudulent course of conduct in order to take advantage of Napco's artificially inflated stock price to collectively reap nearly $175 million in insider sales during 2023 and 2024 when Napco's product sales were on a steady decline.

232. As set forth in the chart below, Defendants Soloway and Buchel collectively sold 4,788,000 shares of their personally-held Napco common stock in 2023 and 2024 for combined proceeds of approximately ***$173,916,860*** while in possession of material, non-public information. None of Defendant Buchel or Soloway's sales were made pursuant to a 10b-5 trading plan.

233. Defendant Soloway made the following sales during 2023 and 2024, accounting for 38.4% and 62.3% of Soloway's total holdings in 2023 and 2024, respectively:

| Date | Shares Sold | Price per Share | Transaction Amount[6] | Pursuant to a Rule 10b5-1 Plan |
|---|---|---|---|---|
| 2/13/2023 | 2,012,500 | $31.50 | $63,393,750.00 | No |
| 2/15/2023 | 287,500 | $31.50 | $9,056,250.00 | No |
| **Total 2023 Sales** | **2,300,000** | | **$72,450,000.00** | |
| | | | | |
| 2/14/2024 | 28,000 | $45.12 | $1,263,360.00 | No |
| 3/8/2024 | 2,000,000 | $40.75 | $81,500,000.00 | No |
| 4/8/2024 | 50,000 | $40.75 | $2,037,500.00 | No |
| 5/8/2024 | 250,000 | $44.20 | $11,050,000.00 | No |
| **Total 2024 Sales** | **2,328,000** | | **$95,850,860.00** | |
| | | | | |
| **Total** | **4,628,000** | | **$168,300,860.00** | |

234. In contrast, Soloway only sold 17.5% of his total holdings in 2022.

235. Defendant Buchel made the following sales during 2023 and 2024 accounting for 48.3% and 50% of Buchel's total holdings in 2023 and 2024, respectively:

| Date | Shares Sold | Price per Share | Transaction Amount | Pursuant to a Rule 10b5-1 Plan |
|---|---|---|---|---|
| 2/13/2023 | 87,500 | $31.50 | $2,756,250.00 | No |
| 2/15/2023 | 12,500 | $31.50 | $393,750.00 | No |
| **Total 2023 Sales** | **100,000** | | **$3,150,000.00** | |
| | | | | |
| 2/12/2024 | 10,000 | $44.80 | $448,000.00 | No |
| 3/12/2024 | 50,000 | $40.36 | $2,018,000.00 | No |
| **Total 2024 Sales** | **60,000** | | **$2,466,000.00** | |
| | | | | |
| **Total** | **160,000** | | **$5,616,000.00** | |

[6] The Transaction Amounts for Defendant Soloway's trades on 3/8/2024 and 4/8/2024 do not include an underwriting discount and commission he paid of $1.01875 per share.

236. In contrast, Buchel sold only 21% of his total holdings in 2022.

237. Buchel and Soloway's sales were also suspiciously timed. Both Soloway and Buchel sold shares of Napco common stock right after a positive earnings release on February 6, 2023 when Napco's stock increased approximately 10.4%, while Defendants knew at the same time that the 3G sunset was nearing an end and Napco's product sales had already started declining. Indeed, CW2 confirmed that when CW2 was named Vice President of Sales for Napco's fire and security alarm division in April 2023, sales were already in decline. Likewise, as demonstrated above in Figures 2 and 3 above (¶134), Napco's sales from Intrusion and Access Alarm had declined and remained depressed due to the undisclosed obsolescence and lack of modern functionality of Napco's products.

238. Likewise, both Buchel and Soloway sold their shares shortly after a positive earnings announcement on February 5, 2024 when Napco's stock price increased 18.82% and continued to climb as a result of Defendants' misrepresentations described above.

239. Moreover, on March 8, 2024, Defendant Soloway sold 2,000,000 shares of common stock at a public offering price of $40.75 per share. The shares were sold pursuant to the March 5, 2024 Prospectus, which was filed with the Registration Statement on Form S-3 on March 5, 2024 where Defendant Soloway was ***the only selling stockholder***. At the time of the transaction, Defendant Soloway owned a significant portion of the voting stock and was able to exert significant influence over the business. Thus, the transaction was structured entirely to his benefit and occurred while shares were trading on artificially high prices due to Defendants' fraudulent course of conduct. Defendant Soloway reaped $81,500,000.00 from this transaction, representing 53.97% of his holdings at the time.

240. On March 12, 2024, Defendant Buchel sold 50,000 shares of common stock at an average price of $40.36 per share, for total proceeds of $2,018,000.00. This transaction represented approximately 44.35% of his shares at the time and was not sold pursuant to a 10b-5 trading plan.

241. Defendant Soloway further granted the underwriters a 30-day option to purchase 300,000 additional shares of common stock at the same price and at the same terms as the March 5, 2024 underwriting agreement. Defendant Soloway exercised that provision on April 8, 2024, opting to sell 50,000 shares of common stock at $40.75 a share for $2,037,500.00. The transaction represented about 2.93% of his holdings at the time.

242. After the 30-day option expired, Defendant Soloway sold 250,000 shares of common stock at $44.20 per share for $11,050,000.00 on May 8, 2024. The transaction represented about 15.10% of his holdings at the time. Even though these shares were subject to a lockup agreement in connection with March 5, 2024 underwriting agreement, Defendant Soloway conveniently "received prior written consent from the representatives of the underwriters to sell the shares in open market transactions" as stated on the May 8, 2024 SEC Form 4.

243. The sales sold pursuant to the March 5, 2024 Registration Statement were suspicious in nature because they overwhelmingly benefited Defendants Soloway and Buchel and represented over half of their personal holdings. Moreover, Defendant Soloway was the only selling shareholder, and both Defendants Soloway and Buchel received special favorable exemptions from the underwriting agreement which they exercised to their benefit at a time while the stock price was artificially inflated as a result of their fraudulent course of conduct.

244. Notably, Defendant Buchel—who has engaged in insider trading during the Class Period while playing a key role in the fraud—is, and was, Napco's "Insider Trading Compliance Officer." Pursuant to the Company's Insider Trading Policy, Defendant Buchel is required to "pre-

clear each proposed trade or transfer" of Napco securities by its "executive officers and directors and their [f]amily [m]embers[.]" At the very least, this presented a clear conflict of interest with respect to his own insider sales.

## IX. <u>LOSS CAUSATION</u>

245. During the Class Period, as detailed herein, Defendants materially misled the investing public by publicly issuing untrue statements of material fact and omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading, thereby inflating the price of Napco common stock. The specific statements and omissions enumerated herein were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Napco's business, operations, and prospects.

246. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiffs and the other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made, or failed to correct, a series of materially false or misleading statements concerning Napco's business model, products, operations and prospects. Defendants' statements were materially and objectively misleading when made, as set forth *supra*, and had the cause and effect of creating in the market an unrealistically positive assessment of: (i) Napco's business model and its purported success in executing on that model; (ii) the Company's ability to achieve growth and profits; and (iii) the success and viability of the Company's products, thus causing Napco's securities to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made and/or endorsed by the Defendants during the Class Period resulted in Plaintiffs and other members

of the Class purchasing Napco's securities at artificially inflated prices, thus causing the damages complained of herein.

247. As a result of their purchases of Napco's stock during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price declines in Napco's securities, the corrective events, and the market's reaction negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to Napco that were unrelated to the alleged misstatements.

248. Plaintiffs and the other Class members were damaged when the previously undisclosed risks materialized and/or when Defendants' Class Period misstatements were corrected through a series of partial disclosures. Though each of the disclosures was incomplete, each corrected at least part of Defendants' prior misstatements and omissions concerning Napco's business, leading to price declines that partially corrected Napco's stock price by reducing the extent to which it had been inflated by Defendants' misrepresentations, thereby injuring Plaintiffs and other members of the Class who had purchased Napco securities during the Class Period at prices that had been artificially inflated by the alleged false and misleading statements and omissions alleged herein.

**A. <u>September 5, 2024 Partial Disclosure</u>**

249. Napco's stock price fell in response to the corrective event on September 5, 2024, as alleged *supra*. On September 5, 2024, the Fuzzy Panda Report revealed that Defendants' prior misrepresentations and material omissions concerning Napco's recurring revenue were false when made because, due to the lag between equipment sales and when recurring revenue begins, Defendants were able to conceal declining recurring revenue resulting from decreasing equipment

sales and reported recurring revenue was not reflective of the current state of affairs. As a result, Napco's path to success was to reach its FY2026 Targets was therefore compromised.

250. In particular, on September 5, 2024, the Fuzzy Panda Report alleged Napco's financial picture was "too good to be true" and revealed to investors that Napco's FY2026 guidance was unlikely to be met because Napco's past success was largely attributable to the 3G sunset, which has ended. As a result, the fire radio "mania" is over and fire radio sales would thus stabilize at "best case" scenario at 5% growth a year.

251. Thus, Fuzzy Panda reported the recurring revenue would decline and drop off in the future. Fuzzy Panda further revealed that because Napco had failed to keep up with the competition, its equipment revenue was also doomed to decline, and that it was "highly unlikely" that Prima was going to beat out other products in the residential market.

252. The Fuzzy Panda report corrected Defendants prior false statements, among others, touting increased sales purportedly "driven primarily from the continued growth of our recurring services revenues," which "have grown significantly over the past several years" and "generated a gross margin of 90% during the period" resulting in a "predictable stream of income" that "mitigates the risk of fluctuation in market demand for our equipment products."

253. Upon the news, Napco's stock price declined from $43.39 per share on September 4, 2024, to $35.50 per share on September 5, 2024, a decline of $8.89 per share, or 20.5%, on unusually heavy trading volume.

**B. <u>November 4, 2024 Partial Disclosure and Materialization of the Risk</u>**

254. On November 4, 2024, Napco released its Fiscal Q1 2025 financial results, revealing a decline in equipment sales "primarily due to locking sales decreasing 8%" as a result of "several locking distributors' efforts to temporarily lower their inventory levels" and a 42% decline in Prima sales year-over-year.

255. While Defendants falsely claimed the distributor destocking was only "temporary," they admitted Prima sales had quickly "stalled" after Prima was introduced in Q1 2024 because it lacked the accessories that customers demanded and it took Napco a full year before it was "starting to have a full line of accessories:" This, Buchel described, was a "misstep."

256. Defendants' disclosure partially corrected their prior misstatements that, for example, Napco's locking company sales were "firing on all cylinders" due to the "strength of locking revenue" and "sell-through stats with locking continue to do well."

257. This was also a partial materialization of the undisclosed risk of declining demand for Napco's inferior products with outdated features and technology. The declining equipment sales and distributor destocking reported on November 4, 2024 were a foreseeable consequence of the earlier concealed facts regarding declining demand for Napco's obsolete and outdated products.

258. Upon the news of Napco's declining equipment sales from distributor destocking, Napco's stock price declined from $38.59 per share on Friday, November 1, 2024 to $34.51 per share on Monday, November 4, 2024 on more than double the typical trading volume.

259. Analysts understood from Defendants' statements that Napco missed guidance due to weak locking sales, but maintained their "buy" ratings based on Defendants' false promises that distributor destocking was a one-quarter issue and not a problem with Napco's products. For example, in a November 4, 2024 Lake Street Capital Markets report, the analyst maintained its "buy" rating, recognizing disappointing results from locking equipment but highlighting that "[m]anagement noted several locking distributors are trying to temporarily lower their inventory levels, but they feel confident this is likely a one-quarter issue."

### C. <u>February 3, 2025 Partial Disclosure and Materialization of the Risk</u>

260. On February 3, 2025, Napco released its second quarter 2025 financial results reporting a 16% decrease in equipment sales, a 39% decrease in gross profit on equipment revenues, and a 19% decrease in adjusted EBITDA for the quarter, well below market expectations. Defendants further signaled that Napco would no longer be able to meet its FY2026 Targets of $300 million in revenue and 45% EBITDA margins due to the reduction in equipment sales.

261. Defendants were forced to admit that the decline was driven by continued and intensified destocking by their largest distributors that was not a temporary issue. Buchel revealed that Napco's largest customer had "***eliminated all quarter end purchases from all manufacturers***" to reduce inventory levels and, thus, contrary to Defendants' Class Period misstatements that "demand is huge," Napco had not been generating increased equipment sales because Napco's products were not "innovative" with "a lot of features that the dealers like."

262. The disappointing Fiscal Q2 2025 financial results were a further materialization of the downplayed risk of declining demand for Napco's products, which were obsolete and outdated, contrary to Defendants' misstatements which suggested that demand was strong and described the risks of distributor relationship disruptions as hypothetical when they had already come to fruition.

263. Upon the news, Napco's stock price declined from a closing price of $36.70 per share on January 31, 2025 to $26.93 per share on February 3, 2025, a decline of about 26.62% in the span of just a single day.

264. The market's reaction to the news indicated that it understood Napco's wide miss on sales and profitability meant that Napco's equipment sales were declining, and not improving as Defendants previously told investors. As a result, a number of well-known analysts who had

been following Napco lowered their price targets in response to Napco's disclosures. For example, Craig-Hallum Capital Group, LLC downgraded to a hold rating, because "NAPCO delivered an incredibly disappointing FQ2 with a wide miss on sales and profitability as Equipment Revenues remained weak."

265. Craig-Hallum's downgrade supports that Napco's disappointing Fiscal Q2 2025 financial results were a materialization of the risk. Speaking to the Company's equipment revenues, the analyst noted that "equipment sales have clear volatility as evidenced by several misses over the past year due to one or multiple distributors reducing orders." The analyst further noted that, "[m]anagement cited downside as stemming from two key distributors and channel inventory issues have now been cited several times over the past 5 or 6 quarters, reflecting lower order visibility." Regarding the distributors, "a single distribution partner was responsible for ~$5M of the miss, or over 10% of total revs, with another $1M due to a separate partner going through an executive transition." As a result of the "frequency of misses since Aug 2023", it will take time for Napco "to rebuild credibility".

266. The Craig-Hallum Capital Group analyst further called out Napco's longer term 2026 targets of "$300M in annual revenues with 40%+ Adj EBITDA margins" were "***unreasonable to achieve before at least FY28***", stating, "[g]iven the lag time between cellular radio orders and future RSRs we believe the update suggests the company will be far below the $300M with 40% Adj. EBITDA margin goals that management had targeted by the end of 2026."

267. Likewise, analysts at Davidson noted that, "[a]t this juncture, we fully acknowledge NAPCO's previously targeted $150M in run-rate RSR ($37.5M on a quarterly basis) on or about FY2026-end, ***is unattainable and no longer worth addressing***." Davidson further reduced its

future estimates, to reflect "continued uneven purchasing patterns by key distribution partners, tempering our view on Equipment volumes and the associated RSR ramp."

268. Similarly, Lake Street Capital Markets, while slashing their price target more than 25%, cautioned that, although management believes the distributor problems are a "a one quarter issue," the analysts are worried "that these headwinds are likely to persist throughout FY25, setting up this year to be a transition year from a growth perspective."

269. The decline in the price of Napco's common stock after the corrective disclosure came to light, and/or after the previously undisclosed risks materialized, was a direct result of the nature and extent of Defendants' misrepresentations and/or fraudulent conduct being revealed to investors and the market. The timing and magnitude of the price declines in Napco common stock negate any inference that the losses suffered by Plaintiffs and the other members of Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' material misrepresentations and/or fraudulent conduct.

270. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of Defendants' false statements that artificially inflated, or maintained the artificial inflation in the price of Napco common stock, and the subsequent significant declines in the value of Napco common stock when Defendants' prior misrepresentations were disclosed.

271. The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## X. <u>CLASS ACTION ALLEGATIONS</u>

272. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Napco's common stock during the Class Period (the "Class"); and were damaged upon

the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

273. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Napco's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Napco or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of January 31, 2025, there were 36.4 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

274. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

275. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

276. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Napco;

c) whether the Individual Defendants caused Napco to issue false and misleading financial statements during the Class Period;

d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e) whether the prices of Napco's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

277. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. <u>INAPPLICABILITY OF THE STATUTORY SAFE HARBOR</u>

278. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in

this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with growth projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

279. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

280. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Napco who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

281. At all relevant times, the market for Napco's common stock was an efficient market for the following reasons, among others:

a) Napco's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

b) Napco communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c) Napco was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d) Unexpected material news about Napco was reflected in and incorporated into the Company's stock price during the Class Period.

282. As a result of the foregoing, the market for Napco's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Napco's stock price. Under these circumstances, all purchasers of Napco's common stock during the Class Period suffered similar injury through their purchase of Napco's common stock at artificially inflated prices, and a presumption of reliance applies.

283. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## XIII. <u>CLAIMS FOR RELIEF UNDER SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT AND SEC RULE 10b-5</u>

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### <u>(Against All Defendants)</u>

284. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 283 above as if fully set forth herein.

285. This Count is asserted on behalf of Plaintiffs and the Class against all Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. C 240.10b-5.

286. Section 10(b) of the Exchange Act provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange… To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

287. Rule 10b-5 provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

288. Throughout the Class Period, Defendants, individually and in concert, directly or indirectly disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

289. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the Class, as alleged herein; (ii) artificially inflate and maintain the market price of Napco common stock; and (iii) cause Plaintiffs and other members of the Class, in ignorance of the falsity of the Defendants' statements, to purchase or otherwise acquire Napco common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants took the actions set forth herein.

290. The Individual Defendants (a) Directly participated in the management of Napco; (b) were directly involved in the day-to-day operations of Napco at the highest levels; (c) were privy to confidential proprietary information concerning Napco and its business and operations; (d) were directly or indirectly involved in the oversight or implementation of Napco's internal controls; and/or (e) were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the untrue statements of a material fact or statements that omitted to state a material fact required to be stated or necessary to make the statements made not misleading; were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning Napco; and/or approved or ratified these statements in violation of the federal securities laws.

291. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel to members of the investing public, including Plaintiffs and the Class.

292. As set forth in Section VIII, *supra*, the Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Napco were materially false or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Napco, their control over, and/or receipt and/or modification of Napco's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Napco, participated in the fraudulent scheme alleged herein.

293. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

294. By reason of the foregoing, the Defendants are liable to the Plaintiffs and the other members of the Class for substantial damages which they have suffered in connection with their respective purchases or acquisitions of Napco securities during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(On Behalf of the Section 10(b) Class Against the Section 10(b) Individual Defendants)**

295. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 283 above as if fully set forth herein.

296. This Count is asserted on behalf of Plaintiffs and the Section 10(b) Class against the Section 10(b) Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

297. Section 20(a) of the Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

298. As alleged above, the Exchange Act Individual Defendants violated Section 10(b) of the Exchange Act and/or SEC Rule 10b-5 promulgated thereunder.

299. During the Class Period, the Section 10(b) Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Section 10(b) Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiffs and other members of the Section 10(b) Class had no access to such information, which was, and remains, solely under the control of the Section 10(b) Defendants.

300. The Section 10(b) Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Section 10(b) Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Section 10(b) Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Section 10(b) Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

301. The Section 10(b) Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Napco's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Section 10(b) Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Section 10(b) Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Section 10(b) Individual Defendants are responsible for the accuracy of Napco's corporate statements detailed herein and are therefore responsible and liable for the misrepresentations contained herein.

302. The Section 10(b) Individual Defendants acted as controlling persons of Napco within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, the Section 10(b) Individual Defendants had the power and authority to cause Napco to engage in the wrongful conduct complained of herein. The Section 10(b) Individual Defendants controlled Napco and all of its employees.

303. As alleged above, Napco is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Section 10(b) Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

304. As a direct and proximate result of the wrongful conduct of Napco and the Section 10(b) Individual Defendants, Plaintiffs and members of the Section 10(b) Class suffered damages in connection with their respective purchases and acquisitions of the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF (EXCHANGE ACT AND SECURITIES ACT CLAIMS)

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment, as follows:

a) Declaring this action to be a proper class action under Rule 23, certifying Plaintiffs as class representatives under Rule 23, and designating Lead Counsel as class counsel;

b) Awarding compensatory, rescissory, or statutory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d) Awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 11, 2026

**LEVI & KORSINSKY, LLP**
*/s/ Shannon L. Hopkins*

Shannon L. Hopkins
Gregory M. Potrepka
Amanda D. Foley
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
afoley@zlk.com

*Counsel for Co-Lead Plaintiff Shailesh Patel and the Class*

**POMERANTZ LLP**
*/s/ Murielle J. Steven Walsh*

Jeremy A. Lieberman
Murielle J. Steven Walsh
Emily C. Finestone
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mjsteven@pomlaw.com
efinestone@pomlaw.com

*Counsel for Co-Lead Plaintiff Donna Kramer and the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Donna Kramer*